**In re DOMESTIC AIR TRANSPORTA-TION ANTITRUST LITIGATION**

This Document Relates To: All Actions.

Master File No. 1:90–cv–2485–MHS. MDL No. 861.

United States District Court, N.D. Georgia, Atlanta Division.

March 22, 1993.

ORDER

I. INTRODUCTION
II. FACTS
 A. Background and History of the Litigation.
 B. The Proposed Settlements
 1. The Settlements with American, United, Delta, USAir and ATPCO
 2. The Northwest and TWA Settlements
 3. The Continental Settlement
 C. Preliminary Approval, Notice and Final Fairness Hearing
III. STANDARDS FOR EVALUATING CLASS ACTION SETTLEMENTS
IV. ANALYSIS OF THE SETTLEMENT
 A. Fraud or Collusion
 B. Fair, Adequate, and Reasonable
 1. Stage of the Proceedings
 2. Likelihood of Success on the Merits
 (a). Merits
 (b). Manageability
 (c). Passing–On Defense
 3. Range of Possible Recovery
 4. The Point On or Below the Range of Possible Recovery at Which a Settlement is Fair, Adequate, and Reasonable
 (a). Total Value of the Settlements
 (b). Reasonableness of the Settlements
 5. Complexity, Expense, and Duration of the Litigation
 6. Substance and Amount of Opposition to the Settlement
 (a). Management Travel Consultants

 (b). Woodside Travel Trust
 (c). American Society of Travel Agents
 (d). Andrew Hudders, et al.
 (e). Jane Simon, Inc.
 (f). Dale Saul
 (g). Leeann Bauder, et al.
 (h). Travel Analysts
 (i). Public Citizen, Ralph Nader, and the Center for Study of Responsive Law
 (j). National Business Travel Association, Duke Power and NationsBank
 (k). Coalition for Concerned Travelers
 (*l*). American Express Travel Related Services
 (m). Armstrong World Industries, Inc.
 (n). State Attorneys General
 (*o*). James Morici, et al.
V. CONCLUSION ON SETTLEMENT APPROVAL
VI. ATTORNEYS' FEES
 A. The Appropriate Method of Calculating A Fee Award
 B. Determination of the Appropriate Percentage of the Common Fund to be Awarded as a Fee
 1. The Results Achieved
 2. The Time in Which the Result was Obtained
 3. The Non–Monetary Benefits Conferred Upon the Class
 4. The Economies of Scale Involved in Prosecuting a Class Action
 5. Objections to the Settlement and Application for Fees
 6. Lodestar Analysis
 (a). Hours Reasonably Expended
 (b). The Attorneys' Customary Fees
 (c). Contingency
 (d). The Skill Requisite to Perform the Legal Service Properly
 7. Conclusion on Fee Award
 C. Allocation of Award Among Counsel
 D. Additional Fee Petitions
 1. Counsel for Objectors and Proposed Intervenors Entitled to a Fee Award
 2. Leon Cooper
 3. Marilyn Berger, et al.
VII. CONCLUSION AND ORDER ON OTHER MISCELLANEOUS MOTIONS

---

## ORDER

SHOOB, Senior District Judge.

### I. *INTRODUCTION*

These consolidated actions represent the largest consumer class action considered by this Court, and, quite probably, the largest contemplated by the federal judicial system. The subject matter has been covered extensively by the national media and has generated intense public interest. Before the Court is Plaintiffs' Motion for Final Approval of Settlements with defendants Airline Tariff Publishing Company ("ATPCO"); American Airlines, Inc. ("American"); Continental Airlines, Inc. ("Continental"); Delta Air Lines, Inc. ("Delta"); Northwest Airlines, Inc. ("Northwest"); Trans World Airlines, Inc. ("TWA"); United Air Lines, Inc. ("United");

and USAir, Inc. ("USAir").[1] The combined settlement includes $50 million in cash and discount travel certificates with a face value of $408 million. Also before the Court are the Joint Application of Plaintiffs' Counsel for the Award of Attorneys' Fees and Reimbursement of Expenses and fee petitions filed by several objectors.

At the onset, the Court emphasizes that the settlement does not establish the price-fixing liability of participants in the already beleaguered airline industry[2] and it is unrealistic to expect a recovery that is the equivalent of a victory by plaintiffs at trial. Rather, the settlement of this action represents a reasonable alternative to a protracted litigation in which the Court finds plaintiffs possess a slim chance of recovery. Submission of the settlement to the Court for approval has resulted in a chorus of objectors whose refrain is that the airlines should be required to provide a larger "pot" of cash and unrestricted certificates to the class in settlement of their claims. While some of the objectors are sincere in their concerns and have been helpful in the attempt by the parties to arrive at a fair and workable settlement, many of their suggestions constitute little more than a "wish list" which would be impossible to grant and is hardly in the best interests of the class.

 The Court enjoys a limited but important role in the review of the combined settlement. Conscious of the overriding public policy in favor of settlements. *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977),[3] the Court must scrutinize the settlement for the existence of any fraud or collusion, and determine whether the compromise is fair, adequate, and reasonable. *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984); *Dillard v. Crenshaw County,* 748 F.Supp. 819, 823 (M.D.Ala.1990). The Court may

only approve or disapprove the settlement as presented. It Court may not rewrite the settlement as requested by numerous objectors. *Cotton,* 559 F.2d at 1331–32.

In considering the settlement—one which will substantially affect the future of an entire industry—the Court is aware of the law's tendency to feed on itself as is so well expressed in *Bleak House* when Charles Dickens describes the case in the Lord Chancellor's Court called "Jarndyce and Jarndyce":

> This scarecrow of a suit has, in course of time become so complicated that no man alive knows what it means. The parties to it understand it least, but it has been observed that no two Chancery lawyers can talk about it for five minutes without coming to a total disagreement as to all the premises. Innumerable children have been born into the cause; innumerable young people have married into it; innumerable old people have died out of it. Scores of persons have deliriously found themselves made parties in Jarndyce and Jarndyce without knowing how or why ... there are not three Jarndyces left upon the earth perhaps since old Tom Jarndyce in despair blew his brains out at a coffeehouse in Chancery Lane; but Jarndyce and Jarndyce still drags its dreary length before the court, perennially hopeless.

The time has come for the rational and practical resolution of this complex litigation. The Court has carefully and thoroughly examined the settlement entered into by the parties releasing all claims against defendants in return for a combined cash fund of $50 million and discount travel certificates with a face value of $408 million. The Court finds the proposed settlement is not only fair, adequate, and reasonable, but that it has an economic value to the class of between $254–$356 million. Plaintiffs possess a minimal

---

1. Pan American World Airways, Inc. ("Pan Am") and Midway Airlines, Inc. ("Midway") were also originally named in this action. Subsequent to the institution of the litigation, Continental, Midway, Pan Am and TWA all sought the protection of the bankruptcy courts. Midway and Pan Am have ceased doing business.

2. Burdened by overcapacity, the recent recession, and fare wars, the airline industry has sustained billions in losses since 1990. Standard

& Poor Corporation recently lowered the debt ratings of American, Delta, and United to speculative grade because of the dismal financial condition of the U.S. airline industry.

3. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the 11th Circuit adopted as binding precedent the decisions of the former 5th Circuit handed down prior to September 30, 1981.

chance of recovery should this action proceed to trial, and the precarious financial condition of defendants makes the likelihood of collection of any judgment dubious, and sure to bankrupt the more unstable carriers.[4] Plaintiffs have achieved a certain and worthwhile benefit for the class in exchange for the mere possibility of recovery at some indefinite time in the future. The Court, therefore, grants approval of the settlement.

In addition, class counsel have requested an attorney fee award of $24 million which the Court will reduce by approximately $10 million. Many objectors complain that this action merely amounts to a "lawyers case" where counsel receive an exorbitant amount of cash and urge the Court to award counsel discount certificates instead of cash. This argument, however, totally ignores the value of the settlement and the financial incentive necessary to induce experienced and well-qualified counsel to take on complex and time-consuming cases for the benefit of the public and for which they may never be paid or even reimbursed for considerable out-of-pocket expenses. Accordingly, as payment for the services and the monies advanced by the thirty-seven law firms representing the class, the Court approves a fee award amounting to $14,378,245.74 in attorneys' fees and $1,634,254.26 for reimbursement of expenses. The fee award made by the Court today is reasonable compensation for the considerable results achieved by counsel on behalf of the class. The Court also approves limited awards to certain objectors and an award to representative class plaintiffs.

---

4. In view of the precarious financial position of most of the major airlines and the escalation and maze of fares occurring after deregulation, serious consideration should be given to reregulation of the industry to restore the "just and reasonable" rule to domestic airline pricing.

5. Subsequent to the 21 original filings, another 15 actions were filed in various jurisdictions and transferred to this district, and 6 additional actions were filed in Atlanta for a total of 42 actions.

6. Specifically, plaintiffs contend that the airline defendants each send information regarding their prospective fare changes to ATPCO. Those prices and other information are integrated into the ATPCO computer system. Each of the defen-

## II. FACTS

### A. *Background and History of the Litigation*

Plaintiffs bring these consolidated actions as a class action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 (1985), seeking treble damages and injunctive relief for alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1988). The plaintiffs' complaints, twenty-one in all,[5] were filed in June 1990 in ten jurisdictions throughout the country. Upon the motion of a number of plaintiffs, the Judicial Panel on Multidistrict Litigation transferred all cases to this Court for consolidated pretrial proceedings. *See* Order of the Judicial Panel on Multidistrict Litigation dated November 2, 1990.

The crux of plaintiffs' complaint charges that the defendants, beginning at least as early as January 1, 1988, conspired to fix the prices of passenger air transportation. Plaintiffs allege that the airline defendants and ATPCO had an agreement or understanding not to engage in price competition with any defendant airline on routes to or from all defendants' hub airports. According to plaintiffs, defendants conducted their pricing conspiracy through defendant ATPCO's computerized fare system to which each airline defendant subscribed. Utilizing the ATPCO system as a clearinghouse facilitating collusion, the airline defendants are alleged to have exchanged current and future price information, signalled price changes, and solicited agreement as to those changes.[6]

---

dant airlines checks its computers on a daily, hourly, or minute-by-minute basis in order to ascertain whether any prospective fare changes have been proposed by other airlines. Plaintiffs allege that when a proposed fare increase, effective at a future date, appears in the system, it constitutes an offer to the other airlines to agree to the price level proposed. Under the agreement, if other airlines do not accept the offer and match the increase, the proposing airline will pull the increase from the system. The airlines allegedly manifest their acceptance of the offer by entering a fare into the ATPCO system that matches the offer in amount and effective date. Plaintiffs also allege that other signalling practices facilitated a conspiracy to fix prices.

The first settlements in the action were reached early in the litigation and prior to class certification. Plaintiffs entered into settlement agreements with Northwest on May 15, 1991, and TWA on June 4, 1991. Northwest agreed to provide $5 million in cash and discount travel certificates with a face value of $11.5 million. The TWA settlement provides $1 million in cash and $20 million in certificates. The terms of the settlements were reported to the Court and, on September 23, 1991, the Court entered Pretrial Order No. 5 preliminarily approving the proposed settlements.

The initial stages of litigation were consumed with plaintiffs' pursuit of class certification under Federal Rule of Civil Procedure 23(b)(2) and (b)(3). Defendants vigorously opposed plaintiffs' class certification motion and argued that (1) airline services are not fungible products and, consequently, there were no common issues of fact appropriate for class treatment; (2) the size of the class was so large and the industry so complex as to render a class action unmanageable; (3) it was not possible to identify class members; and (4) fare changes were so widely divergent that impact or fact of damage was not a common issue and, therefore, damages were not susceptible of a formulaic damage calculation.[7]

Over defendants' persistent objection, the Court found that common questions of law and fact predominated over individual issues in the action and that plaintiffs had met their burden of showing that the alleged antitrust violations, impact, and damages may be proven through generalized proof. Accordingly, the Court certified a class consisting of

All persons in the United States, who, during the period January 1, 1988, to the present, purchased domestic airline passenger tickets from one or more of the defendant airlines for air transportation on a single, defendant airline to and/or from a

defendant's hub (as defined in ¶ 23 of Plaintiff's Amended Consolidated Complaint), (but excluding defendants, their parents, subsidiaries and affiliates and the directors, officers and employees of defendants, their parents, subsidiaries and affiliates and all governmental entities).

*In re Domestic Air Transp. Litig.,* 137 F.R.D. 677, 697 (N.D.Ga.1991). The Court directed the parties to confer concerning the content, timing, and method of notice to be given the class and to present the results of that collaboration in writing to the Court.

The issue of notice was as contested as that of class certification. Plaintiffs submitted a proposal for a massive, unprecedented publication and public awareness notice program, at an ultimate cost of $3.2 million. Plaintiffs contended that no individual class members could be adequately identified for individual mail notice and that the publication program was the best notice practicable under the circumstances. In addition to the publication program, defendants insisted that individual notice be mailed to a list of approximately 10 million names and addresses associated with the credit card numbers culled from defendants' ticket coupons. After a hearing on the issue, the Court found that names and addresses of class members could not be identified by any reasonable method and ordered that the class be notified using the massive publication and public awareness program. *In re Domestic Air Transp. Litig.,* 141 F.R.D. 534 (N.D.Ga.1992).

On January 31, 1992, the Court approved the final notice to the class submitted by plaintiffs and directed plaintiffs to initiate the notice publication program beginning the week of March 15, 1992. On February 7, 1992, defendants filed an appeal to the Eleventh Circuit Court of Appeals from Pretrial Order No. 6 and the Court's order directing notice.[8] The Court subsequently stayed the

---

7. For a detailed examination of defendants' arguments and the expert testimony presented on the certification issues, see *In re Domestic Air Transp. Litig.,* 137 F.R.D. 677 (N.D.Ga.1991).

8. Defendants sought appellate review of that portion of the Court's notice order requiring publication of class notice in the in-flight magazines carried on defendants' airplanes and the posting

of notice in defendants' ticket offices, claiming a violation of the airlines' First Amendment right to freedom of speech. Based on their assertion that the list of names obtained from credit card numbers (the "TRW list") was a list of class members, defendants also argued that the Court had erred in failing to order plaintiffs to give individual notice to the names and addresses on that list. In addition, defendants' appeal encom-

notice program pending disposition of the appeal. *See* Order of February 20, 1992.

On June 24, 1992, plaintiffs and defendants American, Delta, United, USAir, & ATPCO informed the Court that they had reached a proposed settlement of the action. The Court granted their joint motion to stay the proceedings except as to matters relating to the settlements.

### B. *The Proposed Settlements*

An analysis of the compromise reached in a class action entails a complete understanding of the terms of the settlement and the negotiations leading up to the settlement. The essence of the present settlement is a discount travel certificate program combined with a relatively small cash settlement. The settlement class for the purpose of all of the settlement agreements consists of

> All persons in the United States who, during the period January 1, 1988, to June 30, 1992, were the purchasers (as defined in the latest Settlement Agreements) of domestic airline passenger tickets from American Airlines, Inc., Continental Airlines, Inc., Delta Air Lines, Inc., Midway Airlines, Inc., Northwest Airlines, Inc., Pan American World Airways, Inc., Trans World Airlines, Inc., United Air Lines, Inc. or USAir, Inc. for air transportation to or from a hub (as defined in the Settlement Agreements) or on a single airline connecting at such a hub (but excluding all governmental entities, defendants, their parents, subsidiaries, and affiliates and the directors, officers and employees of defendants, their parents, subsidiaries and affiliates).

passed the issue of whether notice ordered by the Court was materially misleading to the extent it left open the possibility of a class-wide or lump sum judgment following a trial of common issues. The appeal had been fully briefed and scheduled for argument by the time the final pending settlements were reached and the parties thus entered into a Consent Motion for Stay of Appeal, which was granted on June 29, 1992.

Order dated July 13, 1992, at 1. What follows is a review of the terms of the individual settlements in this action.

### 1. *The Settlements with American, United, Delta, USAir, and ATPCO*

The settlement with the remaining defendants includes $44 million in cash and discount travel certificates with a face value of $368.5 million. Each airline made contribution to the cash and certificate settlement funds in the following amounts:

| Carrier | Cash | Certificates |
|---------|------|--------------|
| American | $14,216,958 | $121,973,500 |
| Delta | $11,854,630 | $101,706,000 |
| United | $12,928,412 | $110,918,500 |
| USAir | $ 5,000,000 | $ 33,902,000 |

Under the agreement, plaintiffs agreed to release all claims against defendants for conduct charged in the conspiracy. The settlement does not include the injunctive relief provided for in the Northwest and TWA settlements, but defendants do agree to maintain formal antitrust compliance programs.

The travel certificates provided for in the agreements fall into two categories: certificates that are interchangeable for travel on American, Continental, Delta, TWA, USAir, and United and travel certificates that can be used for travel on Northwest only.[9] The maximum amount of certificates that may be used by a single claimant as a credit against a single round trip ticket increases as the round trip price increases according to the following chart:

| Northwest Certificate Amount | Round Trip Price | Other Airlines Certificate Amount | Round Trip Price |
|---|---|---|---|
| $ 25 | $100–200 | $ 10 | $ 50 or over |
| 50 | 201–300 | 25 | 250 or over |
| 75 | 301–400 | 50 | 500 or over |
| 100 | 401–500 | 75 | 750 or over |
| 125 | 501–750 | 100 | 1000 or over |
| 150 | 751–1000 | 125 | 1250 or over |
| 200 | 1000 + | 150 | 1500 or over |

9. While the initial settlement with TWA did not provide for interchangeable coupons, counsel for plaintiffs and TWA negotiated an amendment to the initial agreement providing that the coupons would be interchangeable and amending the TWA settlement class to conform it to that described in the most recent agreement. No other terms of the TWA agreement were changed.

Any certificate, whether interchangeable, can be used at full face value as a credit against the price of any published round trip fare, including supersaver and similar advance purchase excursion fares.

To receive certificates, class members must submit claims based on the amount of class travel purchased. Class members who wish to claim fewer than five round-trip or ten one-way class tickets must file Claim Form A. Claim Form B claimants must have purchased at least five round-trip or one-way class tickets and their purchases will be automatically valued at $2,500 regardless of the actual purchase amount. Class members who file a long Claim Form C must have purchases in excess of $2,500 during the class period. The certificates issued by American, Continental, Delta, TWA, United, and USAir will be divided into a base fund of settlement certificates in the amount of $268,984,000 and will be distributed to all claimants on a per capita basis up to $100 per claimant. A supplemental fund of these fund of these certificates in the amount of $127,516,000 will be distributed to B and C form claimants, in addition to their fund distribution, on a pro rata basis.[10]

Class members entitled to certificates of $100 or less in face value will receive certificates effective on the date of mailing. A class member who is entitled to certificates exceeding $100 in face value will receive $100 in certificates valid on the date of mailing, and, to the extent practicable, the additional certificates will be evenly split between certificates immediately effective and those that become effective one year after the date of distribution. The interchangeable certificates are redeemable up to thirty-six months from date of mailing. The Northwest certificates must be redeemed within twenty-four months of mailing.

All tickets purchased with certificates may be used for travel within one year after the ticket is issued or earlier if a fare rule applicable to a ticket so requires. While each certificate may be used only by the person to whom the certificate is issued or members of that person's immediate family, class members who are natural persons may, at the time of filing a claim, designate another natural person to receive their certificates. Certificates issued to a corporation or other legal entity may be used by employees of, or partners in, such entity.

The agreements originally provided that the certificates were not redeemable for tickets purchased through travel agents and could be used only to purchase tickets directly from the defendant airlines. The parties initially indicated that the redemption restriction was a "deal breaker" for the airlines because, according to the defendants, in-house redemption of the certificates would greatly reduce, if not eliminate, fraudulent transfer and counterfeiting of certificates. Following considerable objection, the parties informed the Court that defendants would waive the restriction on travel agency certificate redemption contained in the settlement agreement. *See* Order of September 23, 1992.

The cash portion of the combined settlement fund, $50 million, has been deposited into two escrow accounts. Counsel for the class or the Settlement Administration Committee,[11] subject to approval of the Court, may be reimbursed from that fund for the costs of administering the settlement and providing notice. To the extent these expenses, other than those attributable solely to the Continental, Northwest, and TWA settlements, exceed $20 million American, Delta,

---

10. The $11.5 million in Northwest certificates will be distributed based on the response of claimants who indicate that they prefer Northwest certificates. The base and supplemental funds, combined with the Northwest certificates, amount to a total certificate settlement with a face value of $408 million.

11. The settlement agreement with America, Delta, United, and USAir provides that the Settlement Administration Committee shall have responsibility for providing notice to the class, communicating with the class, and administering

the cash fund and various settlements, all subject to Court approval. By Order dated September 23, 1992, the Court appointed a Settlement Administration Committee whose membership had been recommended by the parties. The committee has worked to clarify for the class many of the terms of the agreement, has selected a claims administrator to administer the settlements, and has developed an information program to assist the class in understanding the settlements and in filing their claims.

United, and USAir are responsible for the additional expenses.[12]

The parties describe the settlement negotiations as difficult at times and always at arms' length. There were a number of "deal breakers," including the amount of cash that the airline defendants asserted they were capable of paying. From the beginning of the negotiations, the airline defendants made clear that they did not have significant amounts of cash to pay in settlement and would discuss compromise only if the majority of the settlement fund consisted of travel certificates. Plaintiffs and defendants insist that it was simply not an issue in the negotiations that the airline defendants could conceivably pay an amount of cash approaching the total amount of the settlement reached.

### 2. The Northwest and TWA Settlements

The Class initially reached "ice-breaker" settlements with Northwest and TWA in an attempt to encourage settlements by the other airline defendants. On May 15, 1991, plaintiffs entered a settlement with defendant Northwest under which defendant withdrew any objections it had filed to the then pending motion for class certification, stipulated to a settlement class and agreed to contribute $5 million in cash and discount travel certificates with a face value of $11.5 million. The terms of the travel certificates are substantially similar to those applicable to the latter settling defendants.

The Northwest settlement agreement also provides that for a period of five years, Northwest will not:

 a. introduce any fare reduction that is not available for ticketing upon transmittal by ATPCO to any computerized reservation system;

 b. include in their fare basis codes specific, unique letters that identify another airline in a way recognizable by a third party not familiar with Northwest's internal code basing system; or

 c. access fare information transmitted by other air carriers into ATPCO, until such information is made available by ATPCO to the public.

Under the terms of the settlement agreement, Northwest promises to establish and maintain a formal antitrust compliance program to be administered by Northwest's legal department in consultation with, and approved by, outside counsel to Northwest. The agreement was amended on July 1, 1992, to conform the Northwest settlement class to the class definition contained in the settlement agreement between plaintiffs and the remaining airline defendants.

During the settlement negotiations, plaintiffs indicate that Northwest made it clear that there were two "deal breakers": that the travel certificates could not be used for tickets purchased through travel agents and that Northwest be granted "most favored nation" status, meaning that plaintiffs would not enter into a settlement with any other similarly situated defendant on more favorable terms without offering similar terms to Northwest.

On June 5, 1991, again before class certification, TWA and plaintiffs entered into a settlement agreement under which TWA will make available discount travel certificates with a face value of $20 million in travel certificates and $1 million in cash, assuming approval by the TWA bankruptcy court. TWA agreed to substantially the same terms as those set forth in the Northwest settlement agreement.

### 3. The Continental Settlement

On July 2, 1992, after the settlements with American, United, Delta, USAir, and ATPCO had been entered into, Continental independently agreed with plaintiffs to make available settlement discount travel certificates with a face value of $8 million. The parties report that this was a substantial concession since Continental had filed for reorganization under Chapter 11 of the Bankruptcy Code, and the provisions of the Code automatically barred the class actions from proceeding against Continental. Moreover, the Continental agreement already has received the approval of the bankruptcy court. The terms of the Continental settlement are sub-

---

12. As of December 31, 1992, approximately $7,039,991.73 of the cash settlement fund had been expended on administrative expenses. The majority of this amount was expended to issue publication and mail notice to the class.

stantially similar to the terms of the settlement with the remaining defendants detailed below.

## C. *Preliminary Approval, Notice and Final Fairness Hearing*

On July 13, 1992, the Court preliminarily approved the settlement of the remaining defendants and set the matter down for a full scale hearing on the fairness of the settlements. In the same Order, the Court amended the definition of the certified class for purposes of settlement, and detailed a schedule for the filing of objections and exclusions. The Court also approved the proposed notice program and claims forms submitted by the parties and directed that notice of the certification and settlements proceed.

Notice and claim forms were mailed by first-class mail to the approximately ten million names and addresses on the TRW list of possible class members and to all individuals and entities that had written to a post office box previously obtained by plaintiffs' counsel or who had otherwise requested to be included on the mailing list. In addition, an approved Summary Notice of Pendency of Class Action and Proposed Settlements was published twice between July 30, 1992, and August 6, 1992, in sixty-seven newspapers in sixty-five cities in the United States with a combined total readership of over fifty-two million. The published notice summarized the settlement and provided an address from which to obtain the detailed mail notice and claims forms.

Following the issuance of notice, the Court held a conference on a motion filed by class members who are plaintiffs in a Chicago class action suit ("Chicago plaintiffs") to va-

cate its earlier Order preliminarily approving the settlement. The Chicago plaintiffs filed the motion in response to defendants' articulated position that the claims in the Chicago class action are included in and released by the pending settlements.[13] Because plaintiffs' counsel in the present action were admittedly unaware of the pendency of the Chicago litigation during settlement discussions, the Chicago plaintiffs insisted that the Court must vacate its preliminary approval of the settlements or indicate by order that the Chicago claims are excluded from the release. The Court denied the motion and directed the Chicago plaintiffs that they could act to protect their interests by appearing at the final fairness hearing and objecting to the fairness of the settlements.

After the issuance of notice and before the fairness hearing, numerous parties moved to intervene in the action. The majority of the proposed interventions were travel agent representatives who objected to the prohibition on travel agency redemption.[14] By the September 8, 1992, deadline set forth in the notice, approximately 2,500 individuals elected to be excluded from the class.[15] At the time of the Final Fairness Hearing on October 19, 1992, the Court had received just under 800 filed objections to the settlement. By the same date, approximately 1.7 million requests for claims forms had been received at the post office box indicated in the notice, and 1.4 million claims forms had been filed.

At the Final Fairness Hearing on October 19, 1992, the parties presented their argument for approval of the settlements. Counsel or representatives appeared on behalf of sixty-three objectors and presented various objections to the settlements. While several objectors argued against the fairness and

---

**13.** In the original Chicago class action, plaintiffs alleged that certain airlines charged passengers enplaning in Chicago on flights originating in Chicago a jet fuel tax surcharge that far exceeded the amount of the tax levied by the City. The action eventually charged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, common law fraud, deceit and misrepresentation, and violation of the Illinois antitrust laws.

**14.** The individuals or organizations that have moved to intervene or to appear *amicus curiae* in this action include:

American Express Travel Related Services Company, Inc; American Society of Travel Agents; Armstrong World Industries, Inc.; Leeann Bauder, et al.; Coalition for Concerned Travelers; Andrew Hudders, et al.; Management Travel Consultants, Inc.; Travel Agents of the Carolinas, Inc.; Public Citizen, Ralph Nader, and the Center for Study of Responsive Law; and the Government of the United States Virgin Islands.

**15.** The Court and all of its relatives within the third degree necessarily elected to exclude themselves from the settlement class.

adequacy of the settlements, a large number of objectors presented interpretive questions concerning the administration of the settlements and expressly supported the fairness of the compromise. The Court directed the Settlement Administration Committee to meet with objectors to resolve and clarify the outstanding interpretive issues. The Settlement Administration Committee met with the objectors and presented the Court with a Report and Recommendation concerning the issues resolved at the meeting.[16] *See* Report and Recommendation of the Settlement Administration Committee, filed January 15, 1993.

Having examined the history of the litigation and the details of the proposed settlement, the Court will now set forth the relevant legal standards for reviewing the settlement and evaluate the settlement in light of those standards. Applying the law applicable to class action settlements to the settlement at hand, the Court finds the settlement meets all of the criteria for approval.

### III. STANDARDS FOR EVALUATING CLASS ACTION SETTLEMENTS

Federal Rule of Civil Procedure 23(e) requires judicial approval of class actions settlements. "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Rule 23(e) does not, however, set forth any standards for determining the fairness of the settlement. Rather, the Court must be guided by "the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Bennett v. Behring*, 737 F.2d 982, 986 (11th Cir.1984). Furthermore, settlements of class actions are "highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits." *Bennett v. Behring Corp.*, 96 F.R.D. 343, 348 (S.D.Fla.1982), *aff'd*, 737 F.2d 982 (11th Cir.

1984) (quoting *Miller v. Republic Nat. Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir.1977)).

While approval of a class action settlement is within the Court's discretion, the Court shall not confer approval without scrutiny.

Rather, in order to protect the interests of absent class members, the court must independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interests of those whose claims will be extinguished.

2 Herbert B. Newberg, *Newberg on Class Actions*, § 11.40 (1985). It is the Court's duty to determine the possible existence of fraud or collusion and whether the proposed settlements are fair, adequate and reasonable. *Bennett*, 737 F.2d at 986. In analyzing whether the proposed settlements protect the interests of absent class members, the Court must consider:

(1) the stage of the proceedings at which the settlement was achieved;

(2) the likelihood of success at trial;

(3) the range of possible recovery;

(4) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable;

(5) the complexity, expense and duration of litigation; and

(6) the substance and amount of opposition to the settlement.

*Id.* The burden of proving the fairness of the settlement is on the proponents. *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1126 (7th Cir.1979).

The Court should take into account not only the presentations of counsel, but also other sources, "including the comments of class representatives and class members, the judge's own knowledge of the case obtained during pretrial proceedings, and information provided by persons who in unusual cases may be appointed by the court as special masters ... to assess the settlement." *Manual for Complex Litigation* § 30.42 (2d ed. 1985). In determining wheth-

---

**16.** After consulting with the Court and several travel agency representatives, the Settlement Administration Committee has also undertaken an additional information campaign aimed at the settlement class to ensure maximum participation by the class in the claims process. *See* Order dated 22, 1993.

er to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. "[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977) (citing *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir.1975)); *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). It is essential that the Court not examine the settlement as if defendants had been found liable for violation of the antitrust laws. *See, e.g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455–56 (2d Cir.1974) ("It cannot be overemphasized that neither the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underline the merits of the dispute"); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977) (" '[I]nherent in compromise is a yielding of absolutes and an abandoning of highest hopes' ") (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524–25 (S.D.N.Y.1972)). Finally the Court may only approve or disapprove the settlements as presented; the Court is not free to impose any modifications on the parties. *Manual for Complex Litigation* § 30.41.

## IV. *ANALYSIS OF THE SETTLEMENT*[17]

██ After application of the relevant legal standards to the settlement in this action, the Court finds the compromise suitable for approval and class distribution. In reaching its conclusion, the Court first examines the settlement for the existence of collusion between the parties or their attorneys in arriving at the terms of the settlement. Next, the Court evaluates the settlement to determine if it is fair, adequate, and reasonable. This analysis involves an examination of the stage of the proceedings at which the settlement was reached and a through review of plaintiffs' likelihood of success on the merits of their claims. The Court also determines the range of possible recoveries in the action and examines whether the settlement falls at a reasonable point within the range. In addition, the Court examines the complexity, expense, and duration of continued litigation and reviews the substance and amount of objections to the settlement.

### A. *Fraud or Collusion*

██ The Court finds that the settlement was achieved in good faith and only after extensive and sometimes contentious arms' length negotiations. The conclusion that the parties did not collude in arriving at a settlement involves a negative analysis: whether there is any reason to believe otherwise. The objectors do not suggest any fraud in the settlement process and the Court's review of the records reveals no evidence of improper conduct. Counsel for the parties are experienced, highly capable, and well-known antitrust counsel. Throughout the course of the litigation, plaintiffs' counsel have zealously pursued the best interests of the plaintiff class and defense counsel have been equally diligent in their defense of the action.

The course of settlement negotiations involved good-faith bargaining by all involved.

**17.** In approving these settlements, the Court will examine the settlements collectively to determine if in the aggregate, they are fair, adequate, and reasonable. The settlements were presented by the parties as a collective recovery for the class totaling $458 million. It is appropriate to evaluate the settlements collectively as plaintiffs negotiated each of the settlements as a part of a comprehensive strategy to maximize class recovery from all of the defendants. According to the plaintiffs, the earlier "ice-breaker" settlements were a necessary preliminary step to their obtaining settlements from the remaining, more lucrative defendants. In addition, "the fairest and most reasonable measure of the adequacy of the settlements depends on assessing the total damages suffered by the class resulting from the conduct of all the defendants taken together collectively, and comparing that with the total amount to be paid by the defendants." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir.1981). The Court's finding that the settlements viewed collectively are fair, adequate and reasonable does not imply that the settlements would not withstand individual scrutiny. To the contrary, the Court finds each individual settlement is suitable for approval as well. The Court, however, will examine the settlements in the form presented by the proponents to determine the actual benefit to individual class members.

According to the parties, the initial settlements, even though made with two carriers known to be suffering substantial losses and at a time when the issue of class certification was undecided, involved intense negotiation at arms' length. While approaches seeking settlement were made by and to some of the remaining non-settling defendants prior to class certification, the parties conducted no serious negotiations at that stage. It was not until some time later, after intensive discovery, a decision on class certification and on the form and method of notice, and an appeal, that meaningful negotiations began. The parties report that the negotiations were protracted, difficult, and by no means certain to lead to agreement. Joint Statement of Parties, filed July 7, 1992. Moreover, although negotiated by plaintiffs' co-lead and liaison counsel, the settlements were not accepted until submitted to and unanimously approved by plaintiffs' entire Steering Committee. The Court finds no indicia of fraud or collusion in the negotiating or drafting of the settlements, and concludes that the settlement was achieved in good faith, by arms' length negotiation, and without collusion.

### B. *Fair, Adequate, and Reasonable*

■■■ The determination of whether the proposed settlement is fair, adequate, and reasonable involves the review of several factors identified as bearing upon the approval of the settlement. *See Bennett v. Behring Corp.*, 96 F.R.D. 343, 348 (S.D.Fla.1982), *aff'd*, 737 F.2d 982 (11th Cir.1984). The Court finds that the proponents of the settlement have met their burden of showing that the application of these factors compels ap-

proval of the compromise. What follows are the Court's findings and conclusions regarding the approval of the settlement.

### 1. *Stage of the Proceedings*

The Court finds that the record and progress of this action provide ample basis to evaluate the proposed settlement. At the time of settlement with the remaining defendants, plaintiffs were nearing the final phase of discovery, having had sufficient opportunity to assess the strengths and weaknesses of the case.[18] *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir.1975) ("The fact that all discovery has been completed and the cause is ready for trial is important, since it ordinarily assures sufficient development of the facts to permit a reasonable judgment on the possible merits of the case"). Comprehensive expert testimony had been presented at class certification, droves of depositions had been taken by the parties, and voluminous documents had been reviewed and catalogued. But for a brief period to complete expert discovery, the action was ready for trial. The Court finds that the parties had a full opportunity to evaluate the case on the merits with the assistance of economic and other experts and were in a position to realistically assess the merits of their cause.

### 2. *Likelihood of Success on the Merits*

■■■ By far the most important factor in evaluating the fairness and adequacy of a settlement is the likelihood and extent of any recovery from the defendants absent the settlement. *See Armstrong v. Board of School Directors*, 616 F.2d 305, 314 (7th Cir.1980); *Grunin v. International House of Pancakes,*

---

**18.** The parties conducted extensive discovery during the course of the action, with the bulk of the deposition discovery occurring after the Court's decision regarding notice. Defendants initially served written discovery limited to class certification issues on each of the named plaintiffs and subsequently noticed the deposition of twenty-six of the named plaintiffs. Class counsel filed a motion for protective order seeking to restrict the number of plaintiffs who could be deposed for class certification purposes, and the Court ultimately permitted the deposition of twelve of the named plaintiffs. Before multidistrict transfer, defendants' counsel had already taken the depositions of three plaintiffs. Consequently, in total, 15 plaintiffs were deposed.

Ultimately, plaintiffs reviewed more than 1.6 million pages of documents, 400,000 of which were copied, parts of which were stored in a computerized depository. After the Court's stay of the notice program, the parties proceeded with the completion of mutual fact discovery which expired on June 15, 1992. Plaintiffs conducted deposition discovery in two stages: initial 30(b)(6) depositions of each defendant and a subsequent massive deposition push over a five-month period in the spring of 1992, during which teams of plaintiffs' counsel deposed sixty-eight representatives of defendants and three third parties. Expert discovery was to expire on August 24, 1992, and summary judgement papers were slated for filing on September 23, 1992.

513 F.2d 114, 124 (8th Cir.1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974). The Court, however, has neither the duty nor the right to reach any ultimate conclusions on the issues of fact or law which underlie the merits of the dispute. *See Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977).

> The very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty.

*In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 212 (5th Cir.1981) (quoting *Florida Trailer and Equipment Co. v. Deal,* 284 F.2d 567, 571 (5th Cir.1960)). In fact, absent fraud, collusion or the like, the Court should be hesitant to substitute its own judgment for that of experienced counsel representing the class. *Id.*

Plaintiffs acknowledge the strengths of their case and the risks of litigation: "Arguing this factor is difficult, for while we believe strongly in our case, we recognize the risks involved in complex litigation, the unsettled nature of relevant antitrust law and the factual and evidentiary peculiarities of this case." Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Settlements at 26. Defendants, on the other hand, contend that plaintiffs' claims are entirely without merit and would certainly be disposed of on summary judgment. The Court will not speculate which party would prevail at trial, but concludes that the novelty of plaintiffs' claims and the evidence available to plaintiffs make success uncertain, that continuing problems with the damages aspect of plaintiffs' case may render the action unmanageable, and, most important, that defendants' assertion of the "passing-on" defense presents real obstacles to the manageability of the action on a class basis. In short, plaintiffs' slim chance of success on the merits of their claims weighs in favor of approval of the settlement.

### (a). *Merits*

While "class action suits have a well deserved reputation as being most complex," *Cotton,* 559 F.2d at 1331, the circumstances of this litigation are particularly complex and underscore the risks faced by the class in proceeding to summary judgment or trial. Unlike the conspiracy alleged in the typical price-fixing case, these plaintiffs alleged that defendants' conspiracy was effectuated through a computerized fare filing system. Plaintiffs intended to prove that by utilizing the ATPCO system, defendants would signal their intent to raise prices to a designated level at an identified future date and then wait for "agreement" from the other defendants.

Under existing antitrust laws, to prove the price-fixing alleged, plaintiffs would have to establish that defendants in their use of ATPCO had a conscious commitment or common design or understanding to achieve an unlawful objective, here, to fix prices. *See Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1455–56 (11th Cir.1991) (citing *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)). Proof of an exchange of price data among competitors would not be enough because such communication does not invariably have an anticompetitive effect and can, in certain circumstances, increase economic efficiency and make markets more competitive. The Supreme Court has refused to find that exchanges of information, standing alone, are per se violations of the Sherman Act. *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2875, 57 L.Ed.2d 854 (1978). Also, when circumstantial evidence is proffered to prove the conspiracy, the Supreme Court has limited the permissible inferences that may be drawn. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, "conduct as consistent with permissible conduct as with an illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.*

The Supreme Court has consistently held that advance announcement of prices without

more is not per se unlawful. *See, e.g., Sugar Inst. v. United States*, 297 U.S. 553, 601–602, 56 S.Ct. 629, 643, 80 L.Ed. 859 (1936). Accordingly, price leadership and other activities that have the effect of creating uniform or parallel pricing within an industry have not been found to be per se unlawful. Whether price information exchanged in a given case would be found to violate § 1 of the Sherman Act turns on the facts presented. For example, in *Sugar Institute*, where a trade association established rules for requiring members of the industry to announce by publication prices and terms and further required that the members adhere to those prices and terms, the Court concluded that arrangements merely to circulate or relay announcements were permissible. Because the Court found that the sugar refiners did not consult with and were not required to consult with one another before announcing their prices, but instead made independent pricing decisions, albeit with the pricing information of their competitors in hand, the refiners' activities were proper. *Id.* at 580–81, 585–86, 56 S.Ct. at 634–35, 636–37. The Court held, however, that the requirement of adherence to those prices and terms did constitute a per se violation of § 1. Under *Sugar Institute*, a stabilizing effect due to price information exchange is permitted as long as competitors make independent pricing decisions. *Id.* at 598–99, 56 S.Ct. at 642.

Other courts have developed additional methods of analysis to determine if defendants developed independent pricing decisions or an unlawful conspiracy to fix prices. To ensure that unilateral conduct will not be punished, courts have concluded that "conscious parallelism"—parallel business decisions—is not probative of the existence of a conspiracy unless plaintiffs can demonstrate that the actors are economically interdependent and that, absent an assumption of a conspiracy, each participant would be considered to be acting contrary to its self interests. *Wilcox v. First Interstate Bank of Or., NA*, 815 F.2d 522, 527 (9th Cir.1987). To overcome the presumption of conscious parallelism, courts may consider the existence of "plus factors:" activities that when viewed as a whole or as compound circumstantial evidence, make the inference of conspiracy permissible and can include price parallelism, product uniformity, exchange of price information, and opportunities to meet to form anticompetitive policies. *Id.* at 525–26. In addition, some courts have considered whether the information exchanged was publicly available or provided only among competitors or also and contemporaneously to consumers. *See, e.g., In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 513 (5th Cir.1990). The rationale for the distinction is that information otherwise publicly available is less probative of an inference of conspiracy.

The determination of whether or not the actions complained of by plaintiffs in this action rise to a violation of Section 1 of the Sherman Antitrust Act is subject to an intense analysis of numerous factors, the existence or nonexistence of any of which could result in a finding for defendants. Plaintiffs admit that it would be difficult to succeed on the merits of their claims. The conspiracy that plaintiffs charge in the present action is far from the traditional price fixing case where competitors meet in "smoke-filled rooms" to set prices and agree on retaliatory consequences. Defendants insist that plaintiffs have no direct evidence of defendants' conscious commitment to fix prices and that defendants' use of ATPCO to make advance price announcements is perfectly lawful. The Court agrees with defendants that there are many compelling legitimate business purposes for their actions which may prove that the matching of fares merely amounts to conscious parallelism. An airline that initiates a fare increase with hopes that its competitors will match it may be acting in full compliance with the law.

It is inescapable that plaintiffs' claims do not readily fall within these imprecise parameters of antitrust law. Without more than the allegations in the complaint, the conduct plaintiffs complain of appears to be the lawful advance announcement of prices. Plaintiffs have presented no evidence indicating to the contrary and there has been no meaningful argument made by any of the objectors that defendants' exchange of future price information was motivated by anything other than independent pricing decisions. The Court finds that the present state of antitrust law,

the novelty of plaintiffs' claims, and the lack of any direct evidence proving plaintiffs' claims create considerable risk to the class should plaintiffs proceed to summary judgment or trial.

#### (b). *Manageability*

The risk to plaintiffs in proceeding through trial is highlighted not only by the complexity of relevant antitrust precedent, but also by the difficulty in proving antitrust injury and damages to the class under the circumstances of this case. The Court's decision to certify this case as a class action by no means ensured that all procedural difficulties were overcome. Indeed, the Court recognized that its class certification order was subject to alteration or amendment before the decision on the merits. "To paraphrase Benjamin Franklin, plaintiffs now have their class action, the question is can they keep it." *In re Domestic Air Transportation Litigation,* 137 F.R.D. 677, 696 n. 24 (N.D.Ga.1991). *See also Eggleston v. Chicago Journeymen Plumbers Local Union No. 130,* 657 F.2d 890, 896 (7th Cir.1981) ("a favorable class determination by the court is not cast in stone"), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982).

Defendants have argued that given the size of the class certified by the Court, which is estimated to be between twelve and fifty million members, there would have been no practical way to litigate this case. Defendants argued that it is impermissible to enter a lump-sum judgment in an antitrust class action after a trial of common issues without first adjudicating individual issues pertaining to each class member's standing, injury, and extent of damages.[19] Defendants submit that at some point either this Court or the Eleventh Circuit would have agreed that decertification of the class would have been required since individual issues would have overwhelmed the common ones.

Plaintiffs concede that there are problems with class-wide proof of damages. At the time the Motion for Class Certification was fully briefed, the class had been twice redefined. The class as certified was smaller

than but encompassed within the class defined in the plaintiffs' Second Amended Complaint. This refined class definition was based upon advice from the plaintiffs' expert, Dr. Beyer, that, although the conspiracy was intended by defendants to have the breadth alleged in the Complaint, common impact could likely be shown empirically only for the group of purchasers encompassed within the refined class definition. The difficulties with a damage calculation persisted in the analysis of flights that do not originate or terminate at a defendant's own hub. *See* ¶ 46 of the Affidavit of John Beyer, an Exhibit to Plaintiffs' Reply Memorandum of Authorities in Support of Class Certification. Moreover, some of the benchmarks Dr. Beyer expected to use to assess damages were problematic. For example, because the conspiracy impacted all fares of the defendant airlines, there were no unimpacted products against which to compare the price-fixed fares.

Because antitrust damages may be difficult to measure, courts do not require that they be assessed with precision. *Graphic Prods. Distribs. v. Itek Corp.,* 717 F.2d 1560, 1579 (11th Cir.1983) ("Once an antitrust violation and its causal relation to plaintiff's injury have been established, the burden of proving the amount of damages is much less severe"); *accord In re Plywood Antitrust Litig.,* 655 F.2d 627, 635 (5th Cir.1981), *cert. denied,* 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983). Nonetheless, while plaintiffs claim that a damage calculation is possible, any calculation would be difficult, uncertain, and exceedingly expensive. Accordingly, there were numerous procedural issues and obstacles relating to the damages issue that confronted plaintiffs at the time of the settlements and substantially reduced the likelihood of recovery by the class.

#### (c). *Passing–On Defense*

The issue posing the greatest threat to plaintiffs' success in this action is defendants' assertion of the passing-on defense recognized in *Hanover Shoe, Inc. v. United Shoe Machine Corp.,* 392 U.S. 481, 494, 88 S.Ct.

**19.** This Court ruled that it was premature to determine issues relating to damage methodology in connection with the class notice. *In re*

*Domestic Air Transp. Litig.,* 141 F.R.D. 534, 554 (N.D.Ga.1992). The matter was before the Eleventh Circuit at the time of settlement.

2224, 2232, 20 L.Ed.2d 1231 (1968), and in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 732 n. 12, 97 S.Ct. 2061, 2067 n. 12, 52 L.Ed.2d 707 (1977). *Hanover Shoe* and *Illinois Brick* allow a defendant to defend against claims of standing, impact, liability, and damages by a purchaser in a price-fixing case by proving that the purchaser "passed on," or was reimbursed, the full amount of the alleged overcharge under a pre-existing contractual arrangement with a third party. Certain reimbursed purchasers have no standing to sue for damages because they have not sustained any "injury in fact" or damage to "business and property" as required by § 4 of the Clayton Act.

At the time the case was settled, defendants had several pending motions based on the passing-on defense.[20] Defendants argued that before they could ever have been held liable to any individual plaintiff, and before any member of the class could recover anything, each individual class member asserting a claim would have been required to prove that she was not reimbursed for the purchase price of each ticket on which a claim was being asserted.[21] Defendants urged decertification of the class on the grounds that individual issues associated with each class member's assertion of a claim would predominate over common issues in violation of Rule 23(b)(3).[22] By the time of the settlements, defendants also argued that the passing-on defense applied to the claims of several of the named plaintiffs and had moved for summary judgment with respect to those named plaintiffs.[23] Plaintiffs argue that general liability could be determined at trial and then individual recoveries, based on whether the individual class member was reimbursed, could be made at the time of claims administration.

While unresolved and not thoroughly briefed at the time of settlement, the passing-on defense represented one of the major obstacles to plaintiffs' recovery. Plaintiffs' position does not take into account defendants' right to defend against the claims of individuals included within the class definition who did not suffer the injury contemplated under the Clayton Act. With an estimate of between twelve and fifty million class members, individual determinations of the issue of reimbursement, whether at the liability or claims administration stage, would be not only impracticable but impossible, given judicial resources. Plaintiffs presented no strong argument that individual determinations would not be required under *Hanover Shoe* and *Illinois Brick* and their ability to proceed with the action depended upon retaining class status. The Court finds that plaintiffs' likelihood of success in this otherwise tentative case was seriously threatened by defendants' assertion of the passing-on defense. *See Detroit v. Grinnell Corp.,* 495

---

**20.** The following motions were pending at the time of settlement:

 1. *Motion for Partial Summary Judgment* with respect to the claims of named plaintiffs who had been reimbursed for their ticket purchases.

 2. *Motion in Limine* to establish defendants' right to present evidence of passing on in the liability phase of the trial before the jury, to individual class members' proof of standing, "impact," antitrust injury and "liability."

 3. *Motion for Discovery of Class Members* to require each class member who intended to assert a claim to answer interrogatories as to whether and by whom the class member was reimbursed for his airline ticket purchases.

 4. *Motion to Decertify Class* on the ground that determination of the passing-on defense would involve tens of millions of individual issues that would predominate over any common issues and would require decades to try en masse as a class action before a jury, an impossible task, thereby making the case unmanageable.

**21.** Plaintiffs concede that persons who were fully reimbursed for the cost of their airline tickets could not recover any damages from defendants. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion in Limine filed May 26, 1992, at 3–4.

**22.** The parties dealt with the passing-on issue in the Settlement Agreements by defining "purchaser," for settlement purposes, as the person or entity who paid for the ticket at time of purchase, unless that person was reimbursed the amount paid for the purchase of the ticket pursuant to a pre-existing agreement in which case the reimbursing party shall be deemed the purchaser.

**23.** For example, plaintiff John W. Morse, who purchased at least ten airline tickets on class flights for business travel, charged the purchases on his individual American Express card, personally paid the bills, and then obtained reimbursement from his company. Morse Dep. at 38, 40.

F.2d 448, 457 (2d Cir.1974) (noting that, given the huge amount of judicial time that would have been involved in separate trials pertaining to individual issues, there was a serious question whether the cases could have proceeded as class actions at all).

Thus, there is not one but several obstacles threatening plaintiffs' success on the merits of this action, any of which could eliminate the chance of class recovery. The Court concludes that the likelihood of success on the merits in this case is very low. It would seem unwise, therefore, to risk the substantial benefits of the settlement to the uncertainty of trial.

### 3. *Range of Possible Recovery*

In assessing the settlement, the Court must also establish the range of possible damages that could be recovered at trial and then combine this assessment with plaintiffs' likelihood of prevailing at trial and other relevant factors to determine whether the settlement falls at a point in the range that is fair to the class. At first blush, the immensity of the airline industry would seem to support a correspondingly large recovery since the sales of each defendant for each year within the class period run into the billions of dollars.[24] Even with sales or revenue data, however, estimation of the total damages to the class and thus the possible range of recovery is not simple.

Plaintiffs' expert witness, Dr. Beyer, testified at the class certification hearing that at least three formulaic methodologies could be used to calculate damages for class members.

In each methodology, the average fare or yield on the defendants' class traffic would be compared with a more competitive benchmark in order to compute an overcharge percentage which would measure the extent to which class purchasers paid fares higher than they would have paid absent the conspiracy. Three benchmarks were identified by Dr. Beyer: the fares or yields of the non-defendant airlines during the conspiracy; the yields on the defendant airlines own non-class traffic during the conspiracy; and the yields on the defendants' traffic in an earlier preconspiracy period. *In re Domestic Air Transp. Litig.*, 137 F.R.D. 677, 692 (N.D.Ga. 1991). Assuming that, as recommended by Dr. Beyer, one applies the lowest or minimum overcharge percentage to class purchases, application of a two percent minimum overcharge to the class sales demonstrates the enormity of the numbers involved in this litigation. *See* Statmt. of John C. Beyer submitted as direct testimony for class certification hearing, filed May 29, 1991, at ¶ 64. Recovery after a successful trial on the merits could be in excess of $2,000,000,000, trebled.[25]

### 4. *The Point On or Below the Range of Possible Recovery at Which a Settlement is Fair, Adequate, and Reasonable*

▬ In assessing the settlement, the Court must determine "whether it falls within the 'range of reasonableness,' not whether it is the most favorable possible result in the litigation." *Fisher Brothers v. Cambridge–Lee Indus.*, 630 F.Supp. 482, 489 (E.D.Pa.

---

**24.** For example, AMR Corporation, the parent of American, reported 1991 total operating revenues of $12,887,000,000; class revenues for the year are estimated, based upon Department of Transportation data, to be $8,347,309,000. In 1988, defendants' total operating revenues were $8,824,000,000; class revenues are estimated at $4,328,147,000. Class revenues for each defendant airline, over the period 1988 through the second quarter of 1992 are estimated at:

| | |
|---|---|
| American | $ 34,867,272,000 |
| United | 30,030,302,000 |
| Delta | 32,647,750,000 |
| US Air | 24,348,252,000 |
| Continental | 15,564,704,000 |
| Northwest | 16,330,085,000 |
| TWA | 10,581,443,000 |
| Estimated Total Class Revenue | $108,755,255,000 |

These sales estimates are for the class as certified in Pretrial Order No. 3. While the settlement class is broader in scope, estimation of the corresponding class revenues would entail additional expert analysis, at increased cost to the class.

**25.** In analyzing the range of possible recoveries, the Court will consider an estimate of single, rather than treble, damages. *Fisher Brothers v. Phelps Dodge Indus.*, 604 F.Supp. 446, 451 (E.D.Pa.1985) (citing *Detroit v. Grinnell Corp.*, 495 F.2d 448, 458 (2d Cir.1974). "Potential treble recovery (or, for the same reason, punitive recovery) should not be superimposed as a yardstick for measuring the adequacy of a settlement, lest the settlement negotiation process be derailed from the start." *In re Dennis Greenman Sec. Litig.*, 622 F.Supp. 1430, 1441 (D.C.Fla. 1985).

1985). As the Fifth Circuit explained in *Cotton:*

> it [should not] be forgotten that compromise is the essence of a settlement. The trial court should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."

*Cotton,* 559 F.2d at 1330 (citation omitted). The Court's first step in assessing where the settlement falls within the range of reasonableness is the examination of the total value of the settlement to the class. Then taking into account relevant factors such as the likelihood of success on the merits and defendants' financial position, the Court must determine whether the settlement falls at a point within the range of recovery which is reasonable.

### (a). *Total Value of the Settlements*

Although the Court has held varying opinions on the actual value of the settlements to the class, it is convinced that the travel certificates, in their present form which permit redemption through travel agents, offer substantial benefit to the class. As discussed below, the unprecedented nature of the certificate program makes their actual economic value speculative. After considering the affidavits of the several experts presented in this matter, the arguments of counsel, and the position of several objectors, however, the Court finds that even given the most conservative valuation, the settlement represents a considerable recovery for the class.

The parties contend that the certificate settlement is the equivalent of a cash settlement of $408 million. Defendants insist that "the value of these certificates to an eligible class member is penny for penny and dollar for dollar the face amount of the certificate, provided that the class member chooses to purchase another ticket." Transcript of November 30, 1992, Hearing at 24. Plaintiffs' position is that the certificates have a "near cash" value to those who receive them. *Id.* at 12. All parties agree that the uniqueness and magnitude of the settlements is unprecedented and that the value cannot be determined with any degree of certainty.

The Court cannot accept the parties' unyielding position that the certificates upon issuance have the same value as on the face of the certificates. Common sense and expert testimony dictate that the limitations placed on the certificates by the settlement agreements and the rate at which the class members will redeem the certificates will effect the value of the certificates to the class. *In re National Media Corp. Sec. Litig.,* No. 90–7574, 1992 WL 237362, at *2, 1992 U.S.Dist. LEXIS 16589, at 4 (E.D.Pa. Sept. 14, 1992) ("The court recognizes both the speculative value and actual benefit to the class members of these contingent 'special product discounts.' The actual number of class members is at the present time uncertain and the actual number of class members who will ultimately take advantage of those product discounts is even more uncertain. Accordingly the court is unwilling, for the purpose of computing an award of attorneys' fees, to place an award of cash discounts on equal footing with an award of cash."); *In re Cuisinart Food Processor Antitrust Litig.,* 1983 WL 153, 38 Fed.R.Serv.2d (Callaghan) 446 (D.C.Conn.1983) ("Although the precise dollar benefit to class members depends on the use made of the coupons, each coupon has a potential value of up to its face value").

Before the Final Fairness Hearing, plaintiffs presented the testimony of two economic experts on the value of the certificate settlement. Dr. Richard Golaszewski, an economist from the Wharton School of Economics, opined

> that the economic value of the settlements closely approximates the cash value of the certificates. The terms of the certificates as spelled out in the Settlement Agreements are adequate to ensure that the certificates will be used. First, the redemption period and the redemption rate are sufficient to ensure that typical passengers will be able to redeem the certificates during normal travel patterns. Second, the transferability features of the certificates will enable infrequent travelers to make use of them. Finally, limitations on

the use of the certificates cover only a small fraction of the total airline trips. Affidavit of Dr. Richard Golaszewski, filed October 15, 1992, at 4. After the Court expressed concern about the value of the certificates, Dr. Golaszewski supplemented his earlier affidavit and opined that the present value of the certificates, accounting for the possibility that some of the certificates will be used immediately upon issuance, amounts to $379,394,945. In addition, Dr. Golaszewski also found

> that the settlement certificates are unique in that they have an unusually long redemption period (three years), are redeemable against any published fare, and (with the exception of Northwest) are interchangeable among the five largest carriers in the nation. These factors affect my conclusion that most of the certificates will be used.

Affidavit of Dr. Richard Golaszewski, filed December 7, 1992, at 4. He further concluded that because the program was unprecedented, there was no way to place a numerical value on the probability of certificate use. Finally, Dr. Golaszewski examined the various certificate restrictions and concluded that their effects on the value was de minimis. Affidavit of Dr. Richard Golaszewski, filed December 7, 1992, at 4.

Plaintiffs' second expert, economist Paul H. Rubin, found that the "value to the settlement class members of the certificates involved in this settlement is almost as great as if the settlement were for cash." Affidavit of Paul H. Rubin, filed October 15, 1992, at 4. Relying on the findings of Dr. Golaszewski, Professor Rubin concluded that "there is little doubt that almost all class members will take sufficient trips to use the certificates,"

even in light of the holiday black-out period. Because claimants can transfer the right to the certificate prior to issuance or to a family member after issuance, Professor Rubin said that the value of the settlement would not be substantially affected by the rare claimant who would not travel enough to use the certificates.

The Court finds these experts credible and adopts certain of their conclusions as findings of fact as set forth below: [26]

1. The ability to transfer certificates across defendant airlines and the range of services will increase the number of certificates used.

2. The typical nonbusiness traveler would be expected to take 2.8 times the number of trips required to redeem all of the base fund certificates.

3. The transferability feature of the certificates will enable even infrequent flyers to use their certificates.

4. Limitations on the use of the certificates cover only a small fraction of the total passenger trips.

5. The certificates have substantially greater usefulness than other promotional coupons sometimes distributed by the defendant airlines.

6. The airlines will not be able to negate the economic usefulness of the certificates by raising air fares.

7. Those class members who take the time to apply for the certificates will be most likely to use them.

The Court does not agree, however, with the position of these experts that the economic value of the certificates to the class is the same as the face value of the certificates.

---

**26.** Dr. Golaszewski is the Executive Vice President of Gellman Research Associates ("GRA"), a firm specializing in the economics of transportation and technology. The firm and Dr. Golaszewski have testified on matters involving air transportation before the U.S. Department of Transportation. GRA has studied the demand for airline services, barriers to entry into the industry, the financial health of the industry, and the effects of airline deregulation on the industry. More recently, GRA has been involved in consulting assignments related to business development opportunities for foreign carriers. Finally, Dr. Golaszewski has advised the U.S. Federal Avia-

tion Administration on long-range forecasting of aviation activity. *See* Affidavit of Dr. Richard Golaszewski, filed October 15, 1992.

Professor Rubin is a tenured professor of economics at Emory University in Atlanta, Georgia. His experience in more than forty antitrust and other litigation involved analyzing damages issues by examining consumer welfare. Professor Rubin served as Chief Economist at the United States Consumer Protection Safety Commission and as head of the Consumer Protection Division in the Bureau of Economics at the United States Federal Trade Commission. *See* Affidavit of Paul H. Rubin, filed October 15, 1992.

Rather, the true value of the certificates to the class depends on when the certificates will be used, how they will be used, and who will be using them. While no comparable certificate program exists from which to obtain reliable data and estimate the use of the certificates with certainty, the Court will not simply assume a 100% redemption rate rather than determining an approximate range of likely redemption.

In response to the Court's concern that the experts presented incomplete testimony on the issue of value, plaintiffs filed the previously referred to supplement to Dr. Golaszewski's affidavit, and proposed intervenor Management Travel Consultants, Inc. ("MTC") filed the affidavits of two additional experts attesting to the value of the settlements based in part on likely redemption rates. MTC's experts specialize in marketing, pricing, and buyer decision-making. Daniel A. Nimer, a trained economist and President of The DNA Group, Inc., a consulting firm specializing in the development of marketing and planning strategies for national and international companies, disagrees with the conclusion that $408 million in discount certificates have an economic value of $408 million and concluded that in determining value, one must examine the degree to which some or all of the certificates will be redeemed. Nimer contends that the redemption rate is influenced by the following factors: the ease with which the discount certificates can be redeemed, the identity of the recipients of the certificates, whether they are business or leisure travelers, the total cost of the ticket and the percentage value of the certificates given escalating total fare prices, the number of certificates that will be lost or misplaced, and future fare increases. Affidavit of Daniel A. Nimer, filed January 11, 1993, at 10. Nimer concluded that the economic value was not equivalent to the face value, yet was unable to give a precise dollar valuation absent the completion of the redemption program or a thorough study of likely consumer behavior in the context of the certificate.

The second expert presented by MTC was Dr. Itamar Simonson, an associate professor of marketing at the Haas School of Business at the University of California at Berkeley.

Dr. Simonson agreed with Nimer that the critical question in determining the value of the certificates is the likely redemption rate. According to Dr. Simonson, a 100% redemption rate is an unreasonable estimate given the existing evidence on coupon and rebate redemption. Affidavit of Dr. Itamar Simonson, filed January 11, 1993, at 4–5. In determining the redemption rate on the certificates, Dr. Simonson notes that coupons and rebates often appear more attractive when they are first obtained than when they need to be used. *Id.* at 6. Some recipients of the certificates will forget about them or misplace the certificates and other class members will order the coupon and not redeem it during the redemption period. Whether a class member is a business or leisure traveler will also affect the redemption rate. *Id.*

Dr. Simonson also found that certain factors enhance the likelihood that the class will use the certificates. First, the targeting of the actual users of the service in question will increase the redemption rate. *Id.* at 8. The significant face value of the coupons also suggests a higher redemption rate. Finally, the participation of all major airlines in the certificate program suggests that the redemption rate will be much higher than in conventional coupon programs. *Id.* at 9. Dr. Simonson stated that given the limitations on available data and the difference between this certificate program and other coupon and rebate programs, it is impossible to derive a point estimate of the redemption rate. Instead, he identifies a range estimate of the actual certificate redemption rate of fifty to seventy-five percent. *Id.* at 12.

The Court finds the testimony of experts Nimer and Simonson reliable and persuasive. Their experience in the area of consumer perception and response is integral to an analysis of the value of the settlements. A determination of value cannot be accomplished purely from an economic perspective without estimating consumer response. The Court finds the likely redemption rate essential to the analysis of value. While the certificates offer substantial benefit to the class, as evidenced by the statements of Dr. Golaszewski and Professor Rubin, the varying limitations on the certificate and individual class

---

member preferences will limit the redemption rate and, therefore, decrease the value of the settlement. The Court agrees with the conclusions of all the experts that a precise dollar valuation cannot be given the certificate program, but finds that Dr. Simonson's estimated range of redemption, obtained by examining other coupon programs and adjusting for the unique factors of this case, is a reliable estimate for the purpose of examining the range of value of the settlement in this action.[27]

Therefore, the Court concludes that, after adjusting for the likely redemption rates of 50–75%, the certificate program will have an economic value somewhere in the range of $204 to $306 million. The Court finds that when combined with the cash contribution to the settlement, the value of the settlement ranges from $254 to $356 million.

**(b). Reasonableness of the Settlement**

 In determining under these circumstances whether the amount of the settlement is reasonable, "the Court is not confined to the mechanistic process of comparing the settlement to the estimated recovery times a multiplier derived from the likelihood of prevailing on the merits." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217 (5th Cir.1981). Rather, the Court must be guided by other factors, which will vary from case to case. "[I]n any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in a particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom.*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). In the present action, the economic viability of the airline defendants is an important factor to be considered in analyzing the reasonableness of the proposed settlement as well. *Detroit v. Grinnell Corp.*, 495 F.2d 448, 467 (2d Cir.1974); *Fisher Bros. v. Cambridge–Lee Indus.*, 630 F.Supp. 482, 490 (E.D.Pa.1985); *In re South Central States Bakery Prods. Antitrust Litig.*, 88 F.R.D. 641, 643 (M.D.La.1980) (citing *Seiffer v. Topsy's Int'l, Inc.*, 70 F.R.D. 622, 630 (D.Kan. 1976)).

All parties admit that defendants are in financially precarious straits. *See* Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Settlements, filed August 20, 1992, at 36; Brief of Defendants in Support of the Settlement and in Response to Filed Objections, filed October

27. On January 26, 1993, Objectors Andrew Hudders, et al., filed "Objectors' Supplemental Comments on Appointment of Expert To Establish True Economic Value of Proposed Settlement." Objector Hudders reiterates his position that the true value of the certificates can be established only by estimating the actual redemption rate and that this can most accurately be done only after discovery of prior frequent flyer, certificate, and coupon programs. Objector Hudders predicts a "very low certification redemption rate (e.g., below 25%)" yet offers little basis for this figure. While objector Hudders agrees with many of Dr. Simonson's conclusions, he attacks his finding that the redemption rate range is 50% to 75% and the underlying methodology. Objector Hudders makes no real request of the Court, but states that they "continue to be prepared to take discovery and to work with an appropriate impartial expert to develop a realistic estimate of true value."

The Court has had difficulty ascertaining exactly what these objectors seek. Though represented by seemingly qualified counsel, these objectors have failed to utilize the tools provided by the Federal Rules of Civil Procedure to obtain the information they request and to present their positions. The Court has received far more facsimiles from objectors in the form of letters than appropriate briefs and motions making formal requests supported by appropriate legal authority. In the present pleading, it is unclear what objectors are requesting and the Court will treat the filing as a response to the affidavits of the experts. It is more in the form of a response to the opinions of the experts in this matter. Objectors comments concerning Dr. Golaszewski and Professor Rubin come some three months following the submission of their affidavits and on the eve of the Court's decision on the settlements. Objectors have not presented their own qualified expert refuting the expert conclusions before the Court. They remain convinced that discovery concerning the redemption of frequent flyer awards on individual airlines is the key to an accurate establishment of a redemption rate. Frequent flyer awards do not enjoy the broad transferability available for the present certificates and have many other dissimilarities. *See In re Domestic Air Transportation Litigation*, 144 F.R.D. 421 (1992). While this information might offer some assistance, the Court continues to find the opinion of Dr. Simonson concerning a rough range of redemption rates is sufficient for assessing the reasonableness of the settlement.

9, 1882, at 38–39. In this regard, the immediate factor to be considered is that a $6 billion payment, which is a minimum estimate of trebled recovery, could bankrupt the remaining defendants. The parties presented evidence and expert testimony concerning the recent financial setbacks to the airline industry:

> For a variety of reasons, including soaring fuel costs, the United States airline industry has experienced substantial losses in recent years. For example, since the beginning of 1990, aggregate losses have totalled $6.5 billion. Several U.S. airlines have recently liquidated operations (Pan Am, Eastern, Midway, Braniff), and others are operating in bankruptcy (TWA, Continental, America West). It has been estimated that the industry has lost all the money that it had earned from the time of the Wright Brothers' first flight to the present, plus $1.5 billion more.

Affidavit of Helane Becker, Airline Analyst and Managing Director of Lehman Brothers, Inc., Exhibit 1 to Defendants' Affidavits and Class Member Correspondence In Support of Defendants' Brief filed October 15, 1992.[28] Dr. Golasweski, plaintiffs' expert, recently examined financial stress in the U.S. airline industry and concluded with regard to the present case that

> While the defendant airlines are large companies with high levels of revenues, their ability to withstand the negative financial effects of a cash settlement is questionable. The large losses over the last few years have seriously weakened the financial condition of the defendant airlines. A further requirement to pay out large sums of cash should jeopardize the survival of some defendant carriers, particularly those already in bankruptcy. Were a carrier to go out of business or merge with another domestic carrier, it would likely lead to increased concentration in the U.S. airline industry. First, if a carrier went out of business, it would disrupt service to many consumers of air travel in the near term. Second, increased concentration can lead to reduced competition which would tend to increase the cost of air travel for consumers.

Affidavit of Dr. Richard S. Golaszewski filed October 15, 1992, at page 16–17, ¶ 33.[29] See generally Richard Golaszewski & Matthew Sanders, Financial Stress in the U.S. Airline Industry, 32 J.Transp.Res.F., 313–20 (1992).

The Court finds that should plaintiffs succeed on the merits of their case, the unstable financial condition of the airline industry would render collection of a judgment difficult. Even if plaintiffs were to succeed at collecting a judgment, the effort would be certain to drive the already bankrupt defendants out of business and to force most of the remaining defendants into bankruptcy. The Court will consider the financial effect on the economic viability of defendants in its continued assessment of the reasonableness of the settlement.

Under the circumstances of this case, it is difficult to determine the relative value of the settlement in relation to a possible recovery by plaintiffs in absolute terms especially since this action is probably the largest antitrust class action under the current version of Rule 23 as enacted in 1966.[30] However,

---

**28.** Affidavits submitted by defendants concerning their financial positions show the following losses:

> American—fiscal years 1990 and 1991: $280 million in losses.
> Delta—fiscal years 1991 and 1992: $1.286 billion in losses.
> United—fiscal years 1990 and 1991: $531 million in losses.
> USAir—fiscal years 1990 and 1991: $759 million in losses.

See Affidavits and Class Member Correspondence in Support of Defendants' Brief, filed October 15, 1992.

**29.** Dr. Golaszewski notes that the defendant airlines have undergone two and one half years of record losses. No carrier achieved positive profits for the entire period 1990–92. Dr. Golaszewski reports that Pan Am and Midway have ceased doing business and sold their assets, that TWA and Continental are currently in Chapter 11 and their prospects of reorganization are uncertain, and that Northwest and USAir have sought major capital infusions from foreign carriers. Nearly 800 jet airliners remain idle because of the reduced traffic, and many of the airlines are reducing their fleets and eliminating jobs. Golaszewski Oct. 15th Affidavit at 13–16.

**30.** As the late Professor Newberg noted, "[o]ften, the settlement benefits are speculative in nature and capable of only approximate evaluation.

applying the range of value of the combined settlement, the Court finds that the settlement in this action amounts to approximately 12.7–15.3% of the estimated $2 billion minimum possible untrebled recovery.[31] That the proposed settlement amounts to a fraction of potential recovery does not render the proposed settlement inadequate and unfair. "In fact, there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 n. 2 (2d Cir.1974). The proposed settlement cannot be judged without reference to the strength of plaintiffs' claims and other factors relating to a potential recovery for plaintiffs. *Id.* at 455.

The Court finds that the proposed settlement reflects an appropriate balance between the possibility of a judgment for defendants and of no recovery for the consumers, and the potential of treble, but not necessarily collectable, damages in the alternative. Surviving summary judgment or convincing the jury that the airlines violated the antitrust laws would undoubtedly prove to be difficult and would require a considerable effort in terms of both time and the concomitant expense. While the class faces the real risk of no recovery, the benefits it will receive from the proposed settlements are substantial and immediate. Moreover, even with success, plaintiffs could find collection of a judgment problematic, given that other airlines may seek bankruptcy court protection. The Court finds that the settlement falls well above the "lowest point in the zone of reasonableness." *Newman v. Stein,* 464 F.2d 689, 698 (2d Cir.), *cert. denied sub nom.,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972).

### 5. *Complexity, Expense, and Duration of the Litigation*

The Court can say with certainty that this multidistrict antitrust litigation will require complicated, expensive, and lengthy prosecution and that the legal and factual issues are numerous, uncertain, and complex. To date the costs of litigation advanced by counsel amounts to over $10 million. In addition, an overview of the discovery in this case lends support to the conclusion that the complexity and expense of this litigation warrant approval of the settlement.

Plaintiffs' counsel reviewed more than one and a half million pages of documents produced by defendants and third parties, and, at the time of settlement, were still negotiating responses to outstanding discovery requests. While depositions have been taken, the top tier of officers of most of the defendant airlines have yet to be deposed. The analyses performed by the expert witnesses, both economists and computer analysts, were ongoing, at great expense to the class. Given the volume of documents and number of witnesses, the Court finds that continued preparation for trial would be time consuming, complex, and expensive.

While plaintiffs face the prospect of lengthy and expensive trial preparation, the actual trial is stayed pending a decision by the Eleventh Circuit on class notification issues. Moreover, the burden on plaintiffs is exacerbated by the likelihood of defendants' filing motions for summary judgment. Once plaintiffs had incurred the expense of trial preparation, the appellate process, and summary judgement, they would be met with the necessity of tedious and complex jury selection. The subsequent trial would take months[32] and be followed by appeals.

---

Nevertheless, the settlement may be approved if it is clear it secures some adequate advantage for the class. The settlement does not have to be a *brilliant* one in order to secure judicial approval." 2 Herbert B. Newberg, *Newberg on Class Actions* § 11.45 (1985).

**31.** Even if the Court were to rely on the conservative 25% redemption rate suggested by objectors, under which the combined settlements would equal 7.6% of the estimated minimum recovery, the Court finds that the settlements are reasonable in light of the risks associated with litigation and the precarious financial situation

of many of the defendants. *See In re Four Seasons Securities Law Litigation,* 58 F.R.D. 19, 37 (W.D.Okl.1972) (court approved a settlement of less than 8% of the estimated damages); *Mersay v. First Republic Corporation of America,* 43 F.R.D. 465 (S.D.N.Y.1968) (court approved a 5–10% settlement).

**32.** If, as defendants contend, individual adjudication were required for each class claimant, adjudication of the claims of 2 million claimants could last half a millennium. *See* Defendants' Brief in Support of the Settlement and in Re-

This scenario must be weighed against the certainty of the settlement benefits.

> [T]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere probability of relief in the future, after protracted and expensive litigation. In this respect, "it has been held proper to take the bird in the hand instead of a prospective flock in the bush."

*Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D.Colo.1974) (citing *West Virginia v. Charles Pfizer & Co.*, 314 F.Supp. 710, 743 (S.D.N.Y.1970)). Combined with the airlines' precarious financial condition and the limited cash available to pay any judgments, the prospect of continued litigation suggests that the proposed settlement is in the best interest of the class.

## 6. *Substance and Amount of Opposition to the Settlement*

Having concluded that all other factors weigh in favor of approval of the settlement, the Court must now "examine the settlement in light of the objections raised and set forth on the record reasoned responses to the objections including findings of facts and conclusions of law necessary to support the response." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.1977). The number of objectors is but a factor in the Court's consideration. "A settlement can be fair notwithstanding a large number of class members who oppose." *Id.* The objections to the settlement in this instance, however, are a very small percentage of the ten million notices mailed,[33] and at least 268 of those objections were from class members whose sole

objection was to the now-eliminated restriction on travel agent redemption.[34] Two hundred and twenty-eight of the objections, however, are from corporate objectors who purchased at a much larger volume during the class period than did individual travelers. In any event, the Court finds the number of objections small despite heavy solicitation of objections by various counsel, travel agencies, and certain business associations. *See* Exhibits 2–5 of Plaintiffs' Response to Objections to the Proposed Settlements filed October 9, 1992.

At the Fairness Hearing, counsel or other representatives appeared on behalf of sixty-three objectors. While several objectors argued against the fairness and adequacy of the settlement, a large number of objectors asked questions concerning the interpretation and administration of the settlement and expressly supported the fairness of the compromise. The objectors appearing at the hearing presented the full range of arguments made in the non-appearing filed objections. The Court will examine the objections presented at the Final Fairness Hearing below separately in the order of appearance. In addition, because the status of many of the objectors was not settled at the time of the hearing, the Court will also resolve those issues in its discussion of the objections.

### (a). *Management Travel Consultants*

■■■ Management Travel Consultants, Inc. ("MTC") appeared at the Fairness Hearing individually and as a proposed intervenor on behalf of 2,943 travel agents. MTC did not object to the fairness of the settlements,

---

sponse to Filed Objections, filed October 9, 1992, at p. 36.

**33.** Notice and claim forms were mailed by first-class mail to the approximately 10 million names and addresses on the TRW list supplied by defendants and to all individuals and entities that had written to a post office box previously obtained by plaintiffs' counsel or who had otherwise requested to be included on the mailing list. In addition, an approved Summary Notice of Pendency of Class Action and Proposed Settlements was published twice between July 30, 1992, and August 6, 1992, in 67 newspapers in 65 cities in the United States with a combined total readership of over 52 million. As of the Final Fairness Hearing held on October 19, 1992, 1.4 million

claims forms had been filed and 1.7 requests for claims forms had been received. Approximately 2500 individuals requested exclusion from the class, and 773 objections to the settlements had been filed with the Court. This number amounts to .00773% of the mailed notices. In addition, the Court has received many letters commenting on the settlements which were not filed as formal objections.

**34.** Objections amount to less than 1/100 of 1% of all class members, whether measured by plaintiffs' estimate of twelve million class members or defendants' estimate of fifty million class members. *See Phemister v. Harcourt Brace Jovanovitch, Inc.*, 1984–2 Trade Cas. (CCH) ¶ 66,234 at 66,993, 1984 WL 21981 (N.D.Ill.1984).

but rather stated that the settlement certificates offer "great utility to the air travelers in this case." Transcript of Final Fairness Hearing held on October 19, 1993, at p. 64.[35] MTC appeared at the hearing seeking intervention to assure that the travel agents received appropriate commissions on tickets purchased through travel agents with discount certificates.[36]

MTC's professed need for intervention dissipated by the conclusion of the hearing. During the hearing, defendants met with MTC and other travel agent representatives to discuss the issue of travel agent commissions. On the second day of the hearing, defendants presented the following statement to the Court concerning commissions:

> "Each airline has independently decided that for the life of the coupons it will pay commissions to travel agencies on tickets issued against the settlement coupons on the same basis as other tickets, that is, as if coupons did not exist, provided that the level or percentage of commission paid may vary from carrier to carrier."

Transcript at p. 102. After submission of this statement to the Court, counsel for MTC acknowledged that "much as the travel agents might desire to have a continuing forum to negotiate their commission, we can't turn this court into a commissions review board." *Id.* at 197. MTC considered their limited objection satisfied and supported the settlement in combination with the commissions statement as fair, adequate, and reasonable to the class. Accordingly, the Court finds that MTC's "objection" to the settlement amounts to an endorsement for its approval. The Court will deny MTC's motion for intervention.

### (b). *Woodside Travel Trust*

Woodside Travel Trust ("WTT"), a consortium of very large corporate-oriented travel agencies throughout the United States, originally objected to the travel agent restriction and moved to intervene. Upon resolution of the issue, WTT withdrew its request for intervention and filed a set of revised objections. WTT appeared at the Fairness Hear-

---

**35.** Instead, MTC originally entered the action to object to the prohibition against travel agent redemption.

**36.** The Eleventh Circuit has outlined the requirements for intervention as of right under Federal Rule of Civil Procedure 24(a)

> The party seeking to intervene as of right under Rule 24(a)(2) must show that: (1) his application to intervene is timely; (2) he has an interest relating to the property or transaction which is a subject of the action; (3) he is so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect that interest; and (4) his interest is represented inadequately by the existing parties to the suit.

*Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir.1989). The proposed intervenor must establish each of the four requirements for intervention as of right. Permissive intervention is proper where "an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b). Whether to permit intervention rests within the Court's discretion, and the Court should "consider whether the intervention will unduly delay or prejudice adjudication of the rights of the original parties." *Id.*

MTC's request to intervene in the action for the sole and final purpose of safeguarding commissions does not depend on MTC's status as a class member, someone who purchased a class ticket. Instead, MTC's request is as a non-party representing the economic self-interest of travel agents. The basis of this litigation is plaintiffs' claims of price fixing of air fares by the airline industry and the overcharges to the public resulting from that illegal activity, not the right of the travel agent to a commission. The question before the Court is whether the settlement, taken as a whole, is fair, adequate, and reasonable to the class. Not whether the agreements are fair to the travel agents.

In confirming that under Rule 24(a), a nonparty's interest must be "direct, substantial, [and] legally protectable," the Eleventh Circuit recently made clear that an economic interest alone is insufficient to support intervention.

> By requiring that the applicant's interest be ... 'legally protectable,' it is plain that something more than an economic interest is necessary. What is required is that the interest be one which the *substantive* law recognizes as belonging to or being owned by the applicant.

*United States v. South Fla. Water Management Dist.*, 922 F.2d 704, 710 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 407, 116 L.Ed.2d 356 (1991). MTC has identified no legally protectable interest in these proceedings, particularly given the elimination of the travel agent prohibition. The Court finds that what amounts to an economic arrangement between the travel agents and the airlines on the redemption of these certificates does not entitle MTC to intervention. In addition, MTC has presented no argument entitling it to permissive intervention. Such intervention would unduly delay and prejudice the interests of the class.

ing seeking clarification on the following issues:

1. The payment of commissions to travel agents,
2. The limits on the types of proof of purchase,
3. What constitutes "domestic travel,"
4. What constitutes "roundtrip fare," and
5. Who constitutes a "reimbursing party."

At the hearing, the Court directed the Settlement Administration Committee to meet with objectors like WTT to clarify many of the outstanding issues relating to the settlements. As mentioned earlier, the issue of commissions to travel agents was resolved at the hearing and there was no objection made by WTT to the proposed resolution.

Following the hearing, the Settlement Administration Committee met with numerous objectors to resolve interpretive issues like the ones set forth by WTT. As a result, the Court has approved a resolution of the Settlement Administration Committee expanding on, among other things, what constitutes "fair" or "adequate proof of purchase" for large purchasers. *See* Order of November 23, 1992. The Court also accepted, pending approval of the settlements, a Report and Recommendation of the Settlement Administration Committee defining "domestic airline passenger tickets," "round trip fares," and the proper reimbursing party in the manner consistent with WTT's suggestions. *See* Order of January 27, 1993. The Court finds that the issues raised by WTT at the Fairness Hearing have since been resolved and there are no outstanding objections by WTT to the fairness of the settlements.

### (c). *American Society of Travel Agents*

American Society of Travel Agents ("ASTA") is the largest travel trade association in the world, and its active domestic members consist of 10,000 travel agencies with about 13,700 offices throughout the United States. ASTA originally moved to participate on an amicus basis and later filed a motion to intervene. ASTA's primary objection was to the travel agent restriction, and after the waiver of this restriction, ASTA moved for clarification on the issue of travel agent commissions. ASTA appeared at the hearing to address the issue of commissions and accepted the statement of the airlines concerning commissions "in good faith that the airlines will pay commissions in the normal course of business on the tickets issued against these coupons in accordance with whatever policies they have in place, and the market will evolve those policies in the normal course, and that's really the way it ought to be." Transcript at 196. ASTA also requested to meet with the Settlement Administration Committee concerning the proof of claims process, noting that should a meeting take place, intervention may not be necessary.[37]

ASTA later informed the Court that it had participated extensively with the Settlement Administration Committee in resolving its remaining concerns and reported it was now ASTA's position that the settlement should be approved. ASTA suggested that the Court deny its earlier motion for intervention and grant it status as amicus curiae. Moreover, counsel for ASTA stated his opinion that "it seems unavoidable to conclude that the aggregate value of all the coupons will be $408 million." Letter of ASTA, dated December 4, 1993, filed by plaintiffs on February 10, 1993. The Court concludes that ASTA no longer presents objections to the fairness of the settlements, but supports the settlement as offering substantial benefits to the class.

### (d). *Andrew Hudders, et al.*

Objector Andrew Hudders and others ("Hudders") are a group of individual class members who urge the Court to reject the settlement and compel the parties to renegotiate the settlement, incorporating their suggestions. The Hudders objectors have three

---

37. Travel Agents of the Carolinas ("TAC") is a trade Association of 500 travel agents located in North and South Carolina that also appeared at the Fairness ·Hearing and adopted the positions of ASTA on its objections concerning travel agents. Transcript at 105. TAC requested withdrawal of its request for intervention and seeks to proceed on an amicus curiae basis. The Court will grant TAC's request to proceed amicus and to withdraw its motion to intervene and finds that TAC no longer objects to the approval of the settlement but, along with ASTA, supports the compromise as beneficial to the class.

primary areas of complaint: first, they argue that plaintiffs' case is not vulnerable to summary judgment and that there is no risk of decertification or manageability problems; second, objectors insist that defendants, despite their recent financial losses, can easily pay some or all of the settlements in cash instead of certificates; finally, objectors argue that the settlements are virtually costless to defendants and of inadequate value to the class. The Court finds these objections do not warrant disapproval of the settlement.

These objectors rely on the evidence presented by plaintiffs' expert, Dr. John Beyer, on certification to argue that plaintiffs would prevail on summary judgment in this case. Dr. Beyer concluded that yields for defendants' own class traffic (to or from a defendant hub) are significantly higher than the class traffic yields of the non-defendant airlines and higher than defendants' own non-class traffic yields. Objectors argue that Dr. Beyer's conclusions show more than just similar pricing consistent with price competition but that the pricing is a pattern explained only by a price-fixing conspiracy. They insist that defendants' failure to present alternative pro-competitive explanations for Dr. Beyer's findings proves that plaintiffs would prevail on summary judgment.

Surviving a motion for summary judgment is a different matter than presenting evidence probative of impact for the purpose of class certification. The Court relied on Dr. Beyer's findings to determine if plaintiffs met the Clayton Act's requirement that each plaintiff was injured in her business or property by a violation of the antitrust laws. 15 U.S.C. § 15(a) (1988). The Court concluded that Dr. Beyer's conclusions were "logically probative of a loss attributable" to the alleged conspiracy—that there was injury or impact under the Clayton Act. *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 692 (N.D.Ga.1991). Dr. Beyer's conclusions, however, do not prove the existence of a conspiracy, as objectors argue. In fact, his findings expressly assume "the existence of the conspiracy alleged by plaintiffs." *Id.* at 690. At certification, the Court specifically noted that it did not reach a conclusion on the ultimate merit of Dr. Beyer's conclusions. "The weight to be given his testimony and its

effect is for the fact finder in assessing the merits of plaintiffs' claims at a later date." *Id.* In addition, defendants presented alternative explanations for the differences in the yields which the Court found at the certification stage were unsupported by empirical evidence.

Objectors further contend that plaintiffs possess concrete evidence in support of their price-fixing allegations that would assure success on summary judgment, referring to plaintiffs' class certification brief citing specific examples of alleged conspiratorial conduct. Objectors argue that in their review of the discovery conducted in this matter, they uncovered certain pricing documents in which defendants wrote "retaliate" next to a competitor's proposed fare reduction. This is the only evidence cited by objectors in support of their argument, however, and even if these pricing documents exist, they alone would not push plaintiffs over the summary judgment hurdle. Plaintiffs' claims fall within that unsettled group of cases involving "signalling" of advance publication of future price changes, and plaintiffs even admit that the same pricing information may have been available to third parties who subscribe to the ATPCO system, thus weakening their claims. Hudders' arguments do not alter the Court's earlier findings that survival of plaintiffs' claims at summary judgment is uncertain at best.

Objectors next argue that this case presents no manageability problems. The Court does not find objectors' argument concerning manageability convincing. Objectors submit that once liability and a percentage overcharge formula are established, class members need only submit documentation that they purchased tickets on class flights within the class period to prove damages. According to objectors, each claimant would automatically be entitled to a recovery calculated as the ticket price stated on the documentation multiplied by the percentage overcharge already determined by the jury. Objectors fail to address defendants' argument that individual issues pertaining to each class members' standing, injury, and extent of damages must be adjudicated before entry of a lump-sum judgment after a trial of common

issues before adjudicating. This issue was on appeal to the Eleventh Circuit at the time the settlements were entered into and, as noted earlier, plaintiffs have conceded difficulties in damages calculations that may increase manageability problems. The Court has found substantial obstacles to the continued manageability of this action. Objectors' summary conclusion that this action is manageable does not alter the Court's findings.

Objectors also argue that the passing-on defense asserted by defendants is "[a]nother bogus decertification risk stressed by the settling parties." Reply of Objectors to Plaintiffs' and Defendants' Responses to Objections, filed November 5, 1992, at 13. Objectors deem the passing-on defense a non-issue because the settlement class has been redefined to include mutually exclusive subclasses of unreimbursed direct purchasers and those who reimburse the direct purchasers. Defendants argue that such subclasses could not originally have been certified under Rule 23(c)(4) because of typicality problems. Objectors contest defendants' explanation by simply responding that the argument is frivolous. Objectors do not offer a serious analysis of the passing-on issue which the Court continues to hold is a real threat to the continued certification of the class.

■ Objectors next contend that the solvent defendants can easily pay some or all of their settlement shares in cash instead of certificates, alleging that because American, Delta, United, and Northwest have retained earnings of approximately $5.2 billion through the second quarter of 1992, there is no reason for these carriers to pay in the form of certificates. The Court's function in assessing the fairness of the settlements is not to simply determine defendants' ability to provide another type of settlement. Instead, the Court must look at the compromise before it and determine whether, in its present form, the settlement is fair, adequate and reasonable to the class. Defendants' financial position is relevant, not in determining what type of settlement should have been reached, but in assessing their ability to withstand a trebled judgment after trial. Objectors do not refute the precarious financial position of the majority of the defendants in this action, nor do they attack the opinion of Dr. Golaszewski concerning the financial condition of the defendant airlines. Affidavit of Dr. Richard S. Golaszewski filed October 15, 1992, at page 16–17, ¶ 33. Objectors merely contend that the retained earnings available to defendants are sufficient to satisfy a larger cash settlement. That a defendant may have substantial retained earnings does not necessarily indicate that the airline is in a strong enough financial position to withstand a billion dollar judgment since retained earnings are used to purchase airplanes and to keep operations functioning. Objectors' argument does not affect the Court's earlier conclusions on the financial position of defendants and the fairness of the settlements.

■ Finally, objectors insist that the settlement does not offer value to the class in its present form. They argue that an all-coupon settlement is unprecedented and improper, that the redemption rate will likely be low, that the tickets are not marketable because of restrictions on transferability, that more flights per class member will be required because the certificates cannot be aggregated, and that additional restrictions render 20% of the flights ineligible for certificate usage. To support their arguments, objectors consistently urge that the parties have failed to offer sufficient rationale for restrictions imposed on the certificates. The parties, however, do not have the burden of explaining their reasoning behind every condition and limitation to the settlement. Rather, the parties are charged with presenting evidence that the settlement is fair, reasonable and adequate. To prevail on their complaints, objectors in turn must show how the settlement, viewed as a whole, fails to satisfy the criteria for settlement approval. While arguing vigorously for the class, the Hudders objectors have failed to rebut the parties' evidence concerning the fairness of the settlement in light of the substantial risks posed by continued litigation, the financial position of all defendants, and the expense of continued litigation.

Objectors compare the present settlements to a limited number of previous coupon settlements to argue that in all other cases,

discount coupons used in settlement were either freely transferable, redeemable for a certain percentage of cash, or involved coupons plus cash.[38] This litigation and its proposed settlement, however, differ substantially from any previous class action. While plaintiffs may not have obtained the type of coupon settlement previously achieved in unrelated litigation, several qualities of the present certificates distinguish this settlement from previous coupon settlements in a manner that increases the value of the certificates. First, the certificates are reasonably transferable. Class members are free to give certificates to their family members at any time or, in the case of a business, to any of its employees or partners. Moreover, if a class member does not anticipate that she or any family member will fly in the next four years, she also can designate any other person (including a non-family member) to receive her certificates for value when filing her claim. Although the certificates are not universally transferable at all times, the terms of transferability are reasonable and virtually identical to those approved by Judge Greene in the settlement of *In re North Atlantic Air Travel Antitrust Litig.*, No. 84–1013 (D.D.C. March 19, 1986) (class member permitted at the time of claim submission to designate one or more other per-

sons to receive the coupons to which the class member is entitled).

In addition, the certificates can be used toward the purchase of a ticket at any published fare—ranging from the most expensive last-minute business fares to the cheapest deep-discount promotional fares. While objectors have complained that certificates may not be used in conjunction with other bonuses and award certificates, revenues generated from tickets sold on fares that are not published amount to only five per cent of total revenue, and the settlement agreement explicitly provides that no carrier is prohibited from offering additional promotions in combination or conjunction with the certificates. The issue is simply left to each individual carrier in the context of the competitive market. Likewise, defendants report that over eighty-eight per cent of all flights would qualify as round trip flights, and what qualifies as a round trip flight has been refined to include a wider range of flights.[39] Moreover, they can be used for travel for all but a handful of days over a four-year period.[40] And, most important, with the exception of the Northwest certificates, the certificates may be used interchangeably on any of six different major air carriers, thereby al-

**38.** *See States of N.Y. and Md. v. Nintendo of Am.*, 775 F.Supp. 676, 681–82 (S.D.N.Y.1991) ($5.00 coupons useable toward purchase of Nintendo video game cartridge); *Langford v. Bombay Palace Restaurants*, 1991 WL 61107, 1991 U.S. Dist. Lexis 4730 (S.D.N.Y.1991) (coupons good for use at a variety of restaurants and hotels); *W.Va. ex rel. Tompkins v. Coca–Cola Bottling Co.*, 1990–1 Trade Cas. (CCH) ¶ 68,908, 1990 WL 17541 (S.D.Va.1990) (coupons worth $.20 reduction on the retail price of certain Coca–Cola products); *Ohio Pub. Interest Campaign*, 546 F.Supp. 1, 5 (N.D.Ohio 1982) ($1.00 coupons for purchase of food products from settling defendants awarded to class members); *Phemister v. Harcourt Brace Jovanovitch, Inc.*, 1984–2 Trade Cas. ¶ 66,234 at p. 66,987, 1984 WL 21981 (N.D.Ill.1984) (discount coupon entitling the holder to $25 off the price of any of defendant's professional education courses); *In re Cuisinart Food Processor Antitrust Litig.*, 1983–2 Trade Cas. (CCH) ¶ 65,-680 at p. 69,474, 1983 WL 153 (D.Conn.1983) (coupons entitling claimant to purchase Cuisinart products at 50% discount).

**39.** The Settlement Administration Committee has defined "round trip" to include both round trip tickets where the origin and destination points

are the same, and back-to-back one way tickets for travel that starts and ends at the same point. Report and Recommendation of the Settlement Administration Committee, filed January 15, 1993, at 3.

**40.** The certificates are not redeemable for travel on a very limited number of days surrounding the Thanksgiving, Christmas and New Year holidays. These few "blackout" days represent a period of heavy travel during which the industry is unable to meet full consumer demand. Moreover, tickets sold for those periods represent no more than approximately 3–4% of all domestic tickets. *See* Brief of American, Delta, United, USAir, TWA, Continental, and ATPCO in Support of the Settlement and in Response to Filed Objections at 48. Despite objectors' complaint, plaintiffs' expert Dr. Golaszewski reported that the average nonbusiness traveler will take more than sufficient flights to redeem all of the base fund certificates, even considering the holiday blackout period. *See* Affidavit of Dr. Richard Golaszewski filed October 15, 1992, at 10. Such a reasonable and limited restriction, commonly applied in connection with frequent flyer mileage redemption, in no way renders the settlements inadequate.

lowing the consumer to use them for travel between virtually any domestic origin and destination.[41] Thus, no matter where a class member lives or where she may want to travel, at least one of these carriers almost certainly provides service at a conveniently located airport.

That the settlement certificates will remain valid for such a lengthy period of time provides additional assurance that the certificates are worth their full face amount. The interchangeable certificates are valid for ticket purchases for a minimum of three years from the date of issuance.[42] Further, most airline tickets may be used for travel up to one year from the date of purchase. This approximately four-year redemption and travel period eliminates any notion that these certificates resemble demand-practical use to the recipient. Virtually all class members or their family members can be expected to fly in the ordinary course of an extended period. Affidavit of Dr. Richard Golaszewski filed October 15, 1992, at 7–8. Indeed, the four-year period during which these certificates may be used far exceeds the life of coupons regularly issued in court-approved settlements. *See, e.g., In re Cuisinart Food Processor Antitrust Litig.,* 1983–2 Trade Cas. (CCH) ¶ 65,680, at 69,470 (coupons valid for a period of 120 days from date of issuance); *Phemister,* 1984–2 Trade Cas. (CCH) ¶ 66,-234, at 66,987 (coupons expire thirty months

after date of mailing). The Court concludes that the restrictions that the Hudders objectors complain of do not render the settlement valueless and that many of the unique aspects of the certificates enhance the value of the certificates to the class.

Having considered the full range of the Hudders' objections, the Court finds no reason to alter its conclusion that the settlement is fair, adequate, and reasonable.

### (e). *Jane Simon, Inc.*

Jane Simon, Inc. ("Simon") is a corporate class member with aggregate purchases during the class period of $75,000. In its written objection, Simon objected that the certificates may not be applied against more than ten per cent of the purchase price of a ticket and that the time period for redemption of the certificates is limited to three years. Simon also objected to the allocation between the base and supplemental funds[43] and contends that recent filings against the defendants by the Justice Department indicate that plaintiffs' claims are meritorious.[44] Finally, Simon contends that defendants' earnings indicate they are capable of providing an all cash settlement in this matter. The Court has previously considered objections similar to Simon's concerning the limitations placed on the certificates and has determined that the certificates offer substantial benefit to the class. Therefore, at this time the Court will address only Simon's objections

---

**41.** In addition, the certificates may also be used against purchases of tickets for commuter flights on carriers that are majority owned by those settling defendants, such as American Eagle and Air Wisconsin. Unlike promotional coupons, these interchangeable certificates are not designed to induce a passenger to switch travel from one carrier to another.

**42.** The Northwest certificates may also be used at full face value as credit against the price of any published round trip fare published by Northwest where the fare exceeds $100. While these certificates must be used for travel on Northwest, they represent larger redemption amounts than those provided for in the other settlement with a maximum discount exceeding 25% off the cost of a round trip fare on Northwest. These certificates are valid for 24 months from the date of mailing, and, as with the interchangeable certificates may be applied to the lowest super-saver fare, advanced purchase ex-

cursion fare or full business fare; and frequent flyer miles are credited to those flights as well.

**43.** Simon's allocation argument is similar to that set forth by Armstrong World Industries which is addressed by the Court below.

**44.** On December 21, 1992, the Justice Department filed a civil antitrust complaint alleging that Alaska Airlines, American, Delta, Northwest, TWA, USAir, and ATPCO conspired to fix prices through the use of the ATPCO system by increasing fares, eliminating discounted fares, and setting fare restrictions for tickets purchased for travel between cities in the United States. *United States v. Airline Tariff Publishing Co.,* No. 92–2854 (D.D.C. filed Dec. 21, 1992). On the same day, the United States, United, and USAir filed a Stipulation in which they consented to the entry of a proposed Final Judgment containing prohibitions on the conduct of United and USAir. The Justice Department action is substantially similar to the present case and contains more detailed allegations of the alleged illegal conduct.

concerning defendants' financial position and the Justice Department's filings.

Simon appeared at the Final Fairness Hearing to voice one primary objection: the figures for the net worth, operating profit, and cash used for investment contained in the annual reports of American, Delta, and United indicate that defendants are capable of providing a cash settlement in the amount of $458 million instead of the coupon settlement. Once again, the fundamental question is not whether cash is preferable to the class but whether this particular settlement confers a benefit to the class and meets the criteria for Court approval. Simon's entertaining presentation on the supposed financial condition of three of the defendants does not alter the Court's conclusion concerning the value of the settlement in light of the financial position of the industry and other factors. The financial information provided by Simon at the hearing acknowledges the substantial losses in the industry over the past years and does not address Dr. Golaszewski's conclusion concerning the ability of certain airlines to withstand a substantial judgment. Indeed, it is difficult if not impossible to determine what percentage of profits the amount of the settlement represents since it appears that the airlines have, rather than profited, sustained losses in the billions of dollars. Notably, Simon did not provide comparable figures on the financial condition of USAir, Northwest, TWA, and Continental. Simon has offered no evidence to compel the Court to alter its finding on defendants' financial position.

In a supplemental submission in response to recent media announcements, Simon argues that the Justice Department's civil prosecution of many of the airlines in the present action indicates that plaintiffs have a great likelihood of prevailing on the merits of the class claims. Plaintiffs' case, however, is "not *prima facie* proven by the government's enforcement action." *Detroit v. Grinnell Corporation,* 495 F.2d 448, 457 (2d Cir.1974). Moreover, in assessing the likelihood of success for the purpose of arguing for approval of the settlement, plaintiffs had available to

them, under this Court's earlier order, the CID responses filed by defendants in the Justice Department Investigation, as well as information concerning former or present employees of the defendants who were deposition witnesses in the Justice Department's investigation. *See In Domestic Air Transp. Litig.,* 141 F.R.D. 556 (N.D.Ga.1992). However, even after reviewing the Justice Department discovery, plaintiffs acknowledged the risk associated with their claims. The Court finds that the mere filing of a civil complaint by the Justice Department presents no greater proof of success on the merits of plaintiffs' claims. Accordingly, the Court rejects objector Simon's arguments for disapproval of the settlement.

### (f). *Dale Saul*

 Counsel for individual class member Dale Saul appeared at the fairness hearing on behalf of Saul and her three minor children. Saul restated the complaint contained in her written objection that the settlement is unfair to holiday travelers because of the limitations on travel during certain peak holiday periods. The Court concludes, however, that individuals who are members of the class based on the purchase of tickets for flight during the holiday season receive the same benefit in settlement as all other travelers: the use of discount certificates on the purchase of almost all tickets issued by all defendants for flights taking place any time during a four-year period, with the exception of certain peak holiday travel time. The Court has already found that this holiday blackout period amounts to only three to four per cent of airline travel and that the average non-business traveler will take sufficient trips within the redemption period to redeem her certificates. Objector Saul's arguments do not alter the Court's finding on the fairness of the settlement.[45]

### (g). *Leeann Bauder, et al.*

 These objectors are class members who were residing outside of the United States when notice of certification and settle-

---

**45.** Objectors Saul recently filed a withdrawal of her objections. *See* Withdrawal of Objections,

filed March 11, 1993.

ment were published. They claim that they did not receive notice of the class action in accordance with Rule 23, seek intervention in the action, and urge that their counsel, Lewis. J. Saul, be appointed by the Court as Special Counsel and/or appointed to the Settlement Administration Committee in order to develop a plan for providing the foreign plaintiffs with the best notice practicable under the circumstances. Objectors apparently have no complaint as to the fairness of the settlement, only to the notice.

The foreign objectors acknowledge in their papers that because they are members of the class, intervention is not technically required. Objectors cite *American Pipe & Construction Company v. Utah,* 414 U.S. 538, 550-51, 94 S.Ct. 756, 764-65, 38 L.Ed.2d 713 (1974), for the proposition that Rule 23 was designed to avoid the filing of individual motions to join or to intervene in actions such as the present one. Apparently, because the time for filing of objections had passed when these objectors became aware of the class action, they feel, "out of an abundance of caution," that it is necessary to intervene.[46] Memorandum in Support of Motion of Leeann Bauder, et al. to Intervene and to File Objections, filed November 6, 1992, at 5.

■ Intervention for these class members is not appropriate under these circumstances and the Court will accept the filing of the objection of the foreign class members out of time, thus negating the need for intervention. In addition, objectors have made no showing that they are not adequately represented by class counsel. If the person seeking to intervene has the same interests as the parties to the suit, she must rebut the presumption that the party to the suit is an adequate representative. *International Tank Terminals, Ltd. v. M/V Acadia Forest,* 579 F.2d 964, 967 (5th Cir.1978). To overcome this presumption, the proposed intervenor must demonstrate adversity of interest, collusion, or nonfeasance on the part of the party to the suit. *Id.; see also Bradley v. Milliken,* 828 F.2d 1186, 1192 (6th Cir.1987). Reaching a decision on the scope of notice contrary to the position urged by objectors does not render the representation inadequate. Objectors are not entitled to intervention as of right in this instance, nor is permissive intervention in the best interest of the class. Rather, objectors' participation in the objection process will adequately protect their class interests.

The class definition for settlement purposes and upon certification includes "all persons in the United States who ... were the purchasers of domestic airline passenger tickets." Pretrial Order No. 8, dated July 13, 1992, at 1-2. Upon the Court's approval, notice and claim forms were mailed by first-class mail to the approximately ten million names and addresses on the TRW list supplied by defendants and to all individuals and entities that had written to a post office box previously obtained by plaintiffs' counsel or who had otherwise requested to be included on the mailing list. In addition, an approved Summary Notice of Pendency of Class Action and Proposed Settlements was published twice between July 30, 1992, and August 6, 1992, in sixty-seven newspapers in sixty-five cities in the United States with a combined total readership of over fifty-two million.[47]

---

**46.** In Pretrial Order No. 8, as modified by a subsequent Order dated September 2, 1992, the Court set September 25, 1992, as the deadline for filing and serving any objections to the settlements. A procedure for bringing the fact and substance of objections to the Court's attention was described in the Notice mailed to class members. Any person who desired to appear at the Fairness Hearing had to file a notice of intention to appear, a statement of the position to be asserted and the grounds supporting such persons position. Objectors' counsel, Lewis J. Saul, on behalf of Dale Saul and minor children filed a notice to appear at and objections to the terms of the settlement on September 24, 1992. The objections of Dale Saul did not address the issue of notice. Instead, counsel for the first time at the

fairness hearing questioned the sufficiency of notice to foreign claimants and later appeared at the meeting of the Settlement Administration Committee to encourage notice of foreign claimants. Two weeks following the Fairness Hearing, counsel Saul filed the motion to intervene and to object on behalf of foreign claimants.

**47.** The TRW list of possible individual class members did not contain any person with an address outside the U.S., Puerto Rico, Guam, or the Virgin Islands. In addition, the published notice was not carried in the international edition of any newspapers or periodicals. The summary notice was published in *The New York Times,* which does have a modest circulation

■ Objectors complain that there was no plan for notification of those class members presently residing outside of the United States, but who purchased tickets within the United States during the class period on defendant airlines. They refer to the 1990 Census numbers for Americans who resided abroad during 1989, as well as travelers who traveled in the U.S. during the same year. Notably absent from objectors' argument, however, is any evidence of the number of class members who currently reside outside of the U.S. and who allegedly did not receive notice of the settlements. The Settlement Administration Committee has clarified the class as including "anyone who was physically present in the United States at the time of qualifying ticket purchases." Report and Recommendation of the Settlement Administration Committee, filed January 15, 1993, at 2. The class does not include persons who were physically outside the U.S. when tickets were purchased for travel in the United States. Many foreigners who travel in the United States purchase their tickets for travel within the U.S. before arriving here and would not qualify as class members.[48] Most of the foreign claimants, therefore, would be persons who resided in the United States during the class period but who now live elsewhere. Apart from the fact that there is no evidence regarding how many of these persons purchased tickets for class travel during the class period, it would be impossible to determine where they now reside.

As the Court explained in its order certifying the class:

outside of the U.S., even though it does not have an international edition.

Rule 23(c)(2) requires the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Rule 23 doe not mandate individual notice; instead, it requires that "[t]he notice must be such as is reasonably calculated to reach interested parties and apprise them of the pendency of the action." *In re Domestic Air Transp. Litig.,* 137 F.R.D. at 695 (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). The notice approved by the Court was provided in places where it was logical to assume, based on class definition and other circumstances, that a significant percentage of class members would reside. The definition of the class includes only persons "in the United States" which would overwhelmingly consist of persons who reside in the U.S.[49] Notice calculated to reach the most likely class members is adequate under Rule 23. "In all cases the court should strike an appropriate balance [in determining the type of notice] between protecting class members and making Rule 23 workable." *Manual for Complex Litigation* § 30.211 (2d ed. 1985). The Court finds the class received the best notice practicable under the circumstances since it would have been neither reasonable nor practicable to provide the notice requested by foreign objectors.[50]

### (h). *Travel Analysts*

■ The president of objector Travel Analysts appeared at the Fairness Hearing on

---

48. It is not altogether clear that aliens would have any constitutional due process right to notice unless "they have come within the territory of the United States and developed substantial connections with this country." *U.S. v. Rene Martin Verdugo–Urquidez,* 494 U.S. 259, 271, 110 S.Ct. 1056, 1064, 108 L.Ed.2d 222 (1990).

49. The fact that some 4,000 notices and claims forms have been requested and mailed to persons in foreign countries is most probably in response to the worldwide publicity about this action and the settlements. Stories about the litigation and the settlements have appeared in the Asian and European editions of *The Wall Street Journal* and in the *International Herald Tribune.* A story that ran in the national edition of *USA Today* on July 2, 1992, outlining the claims process, ran in full

in all international editions of *USA Today* on July 3, 1992. The international editions of *USA Today* have an estimated total circulation of over 63,000 in 33 countries. In addition, Reuters and Reuters Business Reports which disseminates news items to more than 28,000 subscribers in 136 countries ran a news release describing various aspects of the litigation and containing a post office box number where individuals could write for notices and claims forms.

50. The Settlement Administration Committee recently agreed to run in a limited number of English-speaking publications, information concerning the approval of the settlement and the claims filing process. Objectors Bauder, et al., have withdrawn their pending objections. *See* Withdrawal of Objections, filed March 11, 1993.

behalf of an unspecified group of travel agents and corporations. Travel Analysts' primary position[51] is that the public and travel agents are unsure how to interpret many of the terms of the settlement as contained in the notice. Apparently, this objector felt that the terms of the settlement were too unclear to judge the fairness of the settlement and urged that, in any event, the settlement was not fair unless business travelers were able to use certificates in all of their travel planning.[52]

The president of Travel Analysts participated in the meeting of the Settlement Administration Committee at which the committee clarified all of the terms questioned by Travel Analysts at the Fairness Hearing. *See* Report and Recommendation of the Settlement Administration Committee, filed January 15, 1993. Travel Analysts appeared at the Hearing on Attorneys' Fees in this matter, not to further its objections, but to urge that a public relations campaign be undertaken to clarify many of these issues for the public and the travel agent community. In conjunction with this approval, the Settlement Administration Committee will initiate a program approved by the Court to provide additional, clarifying information to the class and travel agents. *See* Order dated March 22, 1993. The Court believes that adequate, accurate information will be available to the class and the travel agent community to assist in preparation of their claims. Any further clarification questions such as those raised by Travel Agents will be handled swiftly and thoroughly by the Settlement Administration Committee.

The Court has found that the certificates are sufficiently useable by all class members, including pleasure or business travelers, so as to provide substantial benefit. Accordingly, the Court finds that the objections of Travel Analysts to the settlement present no obstacle to the approval of the settlement.

---

**51.** Like most objectors, Travel Analyst also objected in its written submission to the prohibition on travel agent redemption, which was subsequently waived by the parties.

**52.** Travel Analysts also summarily objected to the allocation between the base and supplemental fund. With regard to this objection by Travel

### (i). *Public Citizen, Ralph Nader, and the Center for Study of Responsive Law*

Public Citizen, Ralph Nader, and the Center for Study of Responsive Law ("Public Citizen") are consumer advocates who appeared at the Fairness Hearing in their capacity as class members to object to the fairness of the settlements. In the event that settlements are approved, Public Citizen moves the Court to lift the pretrial protective order sealing certain records in this case.[53] They also request status as an intervenor.

■ To intervene under Rule 24(a), objectors must demonstrate, among other things, that their interests are not adequately represented by the parties to the suit. *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir.1989). To overcome the presumption of adequate representation, the proposed intervenor must demonstrate adversity of interest, collusion or nonfeasance on the part of a party to the suit. *International Tank*, 579 F.2d at 967; *see also, Bradley*, 828 F.2d at 1192. The fact that the proposed intervening party would have reached different conclusions on individual aspects of a settlement does not alone establish inadequacy of representation. *Bradley*, 828 F.2d at 1192 ("A mere disagreement over litigation strategy or individual aspects of a remediation plan does not, in and of itself, establish inadequacy of representation."); *U.S. v. Perry County Bd. of Educ.*, 567 F.2d 277, 280 (5th Cir.1978) (fact that party seeking to intervene would have voted differently than the school board, which was party to the case, is insufficient to support motion to intervene).

■ These objectors have not demonstrated that their interests are unique to them or that they are different in any way from the interests of the class as a whole. In addition, they have failed to show that the class representatives and their experienced class counsel have not adequately represent-

---

Analyst, the Court adopts its findings *supra* in response to the Armstrong objections.

**53.** The Court will consider Public Citizen's motion to lift the protective order by separate order following the issuance of this approval order.

ed their interests. Objectors, moreover, have presented no evidence of collusion between the class representatives and defendants. Instead, objectors have merely expressed dissatisfaction with specific aspects of the proposed settlement and have presented no evidence to demonstrate that they would be better representatives of the class or that they would somehow enhance the representation of the class. The goals of Rule 23 would be defeated if the Court permitted every individual or entity that objected to discrete aspects of the settlement to intervene. *See American Pipeline and Construction Co. v. Utah,* 414 U.S. 538, 550–51, 94 S.Ct. 756, 764–65, 38 L.Ed.2d 713 (1974) (The filing of individual motions to join or to intervene was "precisely the multiplicity of activity which Rule 23 was designed to avoid"). Accordingly, the Court will deny Public Citizen's request for intervention as of right.

In the alternative, Public Citizen moves for permissive intervention under Rule 24(b). The Court has discretion to deny a motion for permissive intervention if "intervention will unduly delay or prejudice the adjudication of rights of the original parties." Judicial economy and convenience are two of the factors that make the class action mechanism viable and justify its use. *U.S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 402–03, 100 S.Ct. 1202, 1211–12, 63 L.Ed.2d 479 (1980). Permitting the intervention would be unfair and would prejudice the rights of all class members for the Court to permit the intervention of all objecting class members. Here the interests of Public Citizen are the same as that of the named parties, to obtain a settlement that is fair, reasonable, and adequate for the class. There are no divergent interests, only differing opinions on how the proferred settlements fit within that framework. Public Citizen's presence through intervention would not accomplish any more than their participation as objectors and would create the possibility of further delay and final disposition of this action. The Court finds no reason justifying permissive intervention.

With regard to the fairness of the settlements, Public Citizen urges that the settlements should not be approved because the numerous conditions placed on the coupons are so restrictive that the value of the settlement to the class is considerably less than $408 million. Specifically, Public Citizen objects to the original restriction on travel agent redemption; the holiday black-out period; the limitations on transferability: the fact that attorneys for the class will receive cash instead of coupons; and the absence of any injunctive relief in the settlements.

The only objection raised by Public Citizen not previously addressed by the Court is the argument that the lack of injunctive relief reduces the value of the settlement. Public Citizen argues that a fair settlement would contain some provision requiring the discontinuance of the pricing practices complained of in the complaint and insists that without such an injunction, the same antitrust violations will likely occur in the future.

As a condition of settlement, defendants American, Delta, United and USAir have agreed to establish formal antitrust compliance programs. In addition, TWA and Northwest have agreed to refrain from certain practices relating to ATPCO for a five-year period. Public Citizen argues that these efforts are insufficient to assure that the complained-of conduct will not occur again. At the Fairness Hearing, plaintiffs reported that the settlement would be defeated if plaintiffs insisted on the inclusion of strenuous injunctive relief and, consistent with their denial of liability, defendants refused to agree to any form of injunctive relief during settlement negotiations. Transcript at 141. In lieu of destroying the settlement or diminishing the actual benefit to the class, plaintiffs determined it was in the best interest of the class to offer defendants no protection for future misconduct in the settlement rather than insist upon injunctive relief. Therefore, while the settlement releases defendants from claims for certain past practices, nothing prevents a class member from pursuing a suit against defendants for future misconduct of the type complained of in the present case.

The Court agrees with plaintiffs that the best assurance against future antitrust viola-

tions by defendants is the persistent threat of litigation by any class member. The Court finds that the right to bring claims against defendants for future misconduct is a valuable right of every class member. The absence of injunctive relief, therefore, does not render the settlement unfair.

### (j). *National Business Travel Association, Duke Power, and NationsBank*

██ National Business Travel Association ("NBTA") is a voluntary organization representing commercial purchasers of travel services. NBTA estimates that its members purchased over $50 billion in total air travel during the class period. Counsel appeared at the Fairness Hearing representing NBTA, Duke Power, and NationsBank. At the hearing, NBTA urged clarification of several terms in the settlement agreement and argued that the settlement should not be approved with the existing allocation arrangement.[54] Following the hearing, NBTA participated in meetings with the Settlement Administration Committee and reported to the Court that all of its interpretive concerns had been resolved. Supplementary Objections of NBTA, Duke Power, and Nations-Bank Regarding Proposed Settlement of Antitrust Litigation, filed November 9, 1992, at 2–3. NBTA continued to object to the allocation between the base and supplemental funds and insisted that membership on the Settlement Administration Committee was necessary to facilitate fair settlement administration.

The Settlement Administration Committee was created by the settlement agreement and appointed by the Court for the purpose of "providing notice to the classes, communicating with the classes, and administering the cash fund and various settlements, all subject to court approval and order." Order dated September 23, 1992, at 1. Membership on the Committee consists of defense counsel, some of plaintiffs' counsel, and the Special Administrative Master. The Committee has refused all requests by objectors for additional membership, but has indicated that future meetings will be open to interested parties and that questions and requests may be submitted for consideration. The Court finds that the Committee has made significant progress in working with objectors to resolve interpretive matters relating to the settlements. The Committee, however, does not have the power to renegotiate any substantive aspect of the present settlements. Membership on the Committee by entities such as NBTA would not result in the changes to the structure of the settlement that NBTA seeks. The Court finds that objectors, other class members, and interested parties have an adequate avenue for communicating their concerns and questions regarding the settlement to the parties responsible for administration. In fact, other than the request for reallocation, a matter that the Committee cannot resolve without abandonment of the present settlement, NBTA presents no other matters that cannot be resolved using the present structure. Accordingly, the Court will deny NBTA's request for membership on the Committee. In addition, for the reasons contained in the discussion of Armstrong's objections to the settlement, the Court does not find NBTA's argument concerning allocation affects its finding of fairness.

### (k). *Coalition for Concerned Travelers*

██ The Coalition for Concerned Travelers ("Coalition") is an unincorporated association of travel professionals and members of the traveling public which was created on August 26, 1992, for the purpose of jointly objecting to the proposed settlement. The Coalition objected to the proof requirements for Long Form C claimants.[55] Since the Coalition's appearance at the Fairness Hearing, the Settlement Administration Committee has adopted a formula developed by the Coalition for submitting Long Form C proof that was the basis of the final proof formula recommended by the Committee and ap-

---

54. American Family Life Insurance Company of Columbus also appeared at the hearing and expressly adopted the objections of NBTA.

55. The Coalition also objected to the original limitation on travel agent redemption which was subsequently abandoned. The Coalition urged that the settlement was unfair because the largest portion of the fund would be financed by the travel agent professionals rather than by the defendant airlines.

proved by the Court. *See* Order dated November 24, 1992. The Court finds that the Coalition's objections have been resolved and that the Coalition stands in support of the proposed settlement.[56]

The Coalition also moved to intervene in the action on the grounds that it has the required direct, substantial, and legally protectable interest in the "long-established distribution system for airline ticket sales." In the alternative, the Coalition argues that because its views differ from that of the named class members, it should be permitted to intervene to protect its interests on the record. The Court finds that the Coalition does not possess the legally protectable interest necessary for intervention as of right and that permissive intervention is not in the best interest of the class. *See Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir.1989). The Coalition desires intervention merely to increase its perceived position in the bargaining process. In any event, the Coalition fully availed itself of the objection process to achieve a beneficial resolution of its outstanding objection. The Court will deny the Coalition's motion for intervention,

### (1). *American Express Travel Related Services*

■ American Express Travel Related Services ("AE") moves for intervention or joinder to seek reimbursement from the settlement fund to cover the expense of providing the necessary documentation to certain class members in support of their claims.[57] AE projects expenses exceeding $400,000 to provide incremental billing statements to customers and management information systems reports to corporate customers.[58] AE contends that by providing information to class member customers, it plays a role in administering the agreement and therefore is entitled to adequate compensation.

■ The Court does not find intervention or reimbursement appropriate in this instance. First, AE does not have a direct, legally protectable interest in the litigation. AE seeks intervention not to protect its interests as a class member and those of other class members but to protect its economic interest in compensation for services provided to class members. An unrelated economic interest alone is insufficient to support intervention. *United States v. South Fla. Water Management Dist.*, 922 F.2d 704, 710, cert. denied, —— U.S. ——, 112 S.Ct. 407, 116 L.Ed.2d 356 (1991). Also, AE is not a party necessary for just adjudication under Rule 19. A party necessary for joinder under Rule 19 must claim "an interest relating to the subject of the action." Fed.R.Civ.P. 19(a)(2). The "interest" language of Rule 19(a)(2) is almost identical to the language of Rule 24(a)(2) and the requirements of the two rules are interpreted in an identical fashion. *See Cascade Natural Gas Corp. v. El Paso Natural Gas*, 386 U.S. 129, 134 n. 2, 87 S.Ct. 932, 936 n. 2, 17 L.Ed.2d 814 (1967). Thus, the Court will not permit intervention or joinder of AE.

■ AE's claim for reimbursement is predicated on the notion that defendants, through the settlement fund, are responsible for the costs individual class members incur in gathering information to support their proofs of claim. Under the negotiated terms of the agreements, however, the purpose of the fund is to pay the costs of providing notice to the class, communicating with the class, and administering the various settlements, as well as attorneys' fees and other such payments as are ordered by the Court. The settlement agreement does not contemplate that the fund would also bear the costs individual class members incur in documenting their proofs of claim. The increased requests by AE's clients for past flight infor-

---

**56.** In fact, the Coalition states that "the actual certificates to be issued against airline antitrust claims will have a face value (yet unknown) that will indeed be worth the value printed on the certificate." Letter of Jon R. Bropst, Chairman, dated December 4, 1992, contained in Plaintiffs' Notice of Filing dated February 10, 1993.

**57.** Citicorp Credit Services, Inc., another card program, joins the request of American Express

for intervention and reimbursement. *See* Affidavit In Support of Motion for Intervention and Application for Reimbursement of Expenses filed November 9, 1992.

**58.** During August, 1992, AE received 32,000 incremental billing statement requests requiring AE to provide 1,200,000 incremental monthly statements at a cost of $247,915.

mation is an expensive but necessary cost of doing business. Moreover, the effect of the settlement on AE is not entirely negative. In addition to the services that it seeks reimbursement for, AE operates as a travel agent and will benefit from the settlement through receipt of commissions. Furthermore, not every class member is an American Express card holder who will seek the services of AE and, therefore, it is inappropriate to charge the entire class for an expense that only a portion of the class will incur. The Court finds AE's grounds for intervention, joinder, and reimbursement without merit and wholly unrelated to the fairness of the settlement.

### (m). *Armstrong World Industries, Inc.*

■ Armstrong World Industries, Inc. ("Armstrong"), along with twenty-five other corporate purchasers of air travel, filed several objections to the settlement and moves for certification of a subclass of plaintiffs consisting of corporate purchasers of airline travel. Armstrong maintains that subclass designation is necessary because corporate purchasers have interests in this litigation which are distinct from and antagonistic to interests of individual and discretionary purchasers of airline travel.[59] The Court finds that subclass designation at this juncture is unnecessary and will result in undue delay. In addition, the Court concludes that the allocation of the settlement fund is fair, adequate, and reasonable to all members of the class, including large corporate purchasers such as Armstrong.

■ In support of its motion for subclass certification, Armstrong has raised several concerns shared by the members of the proposed subclass.[60] Armstrong's primary contentions are that the allocation of the settlement fund is unfair to corporate purchasers of airline tickets and that use of discount travel certificates will be difficult for corporations to administer.[61] Armstrong argues that the settlement should not be approved in its current form and urges that an appropriate curative step is for the Court to form a subclass of corporate purchasers to participate in renegotiation on a fair and equitable division of the settlement among existing class members and to decide on the most efficient method of providing relief to the corporate airline customer.[62]

---

**59.** Armstrong proposes the following subclass definition:

All United States corporations, with airline travel expenditures in an amount to be determined, who, during the period of January 1, 1988 to the present, purchased domestic airline passenger tickets from one or more of the defendant airlines for air transportation to or from a defendant's hub (as defined in Plaintiffs' Amended Consolidated Complaint), or on a single airline connecting at a defendant's hub, (but excluding all governmental entities and defendants, their parents, subsidiaries and affiliates and the directors, officers, employees of defendants, their parents, subsidiaries and affiliates).

In reply to Armstrong's request for subclass certification, National Business Travel Association requests that, should Armstrong's motion be granted, the definition of the subclass be expanded expressly to include: "All United States corporations, partnerships, associations, and other business entities, with air travel expenditures of an amount to be determined." Reply of NBTA to Motion for Subclass Certification filed October 13, 1992. Other objectors join in Armstrong's request for subclass designation of all Long Claim Form C claimants.

**60.** Armstrong, however, expressly supports the amount of the settlement and the distribution of discounts to class members. Transcript at 223.

**61.** Armstrong also objected to the earlier prohibition on redemption through travel agents. As Armstrong concedes, however, this concern has been eliminated by defendants' waiver of the provision. In addition, Armstrong has raised certain other objections to the agreement, claiming that the proof requirements of Claim Form C are burdensome, that the travel certificates should apply to one-way fares, and that a danger of duplicate recovery exists for individuals who have been reimbursed for purchases by their employees. Armstrong does not, however, assert that any of these objections warrants subclass certification.

**62.** Under the settlement agreement, the $408 million in certificates, less the $11.5 million in Northwest certificates, is divided into two funds: the base fund of $268,984,000, which will be distributed on a per capita basis up to $100 per claimant, and the supplemental fund of $127,516,000, to be distributed on a pro rata basis to Form B and C claimants. All claimants to the supplemental fund will also receive a distribution from the base fund. In addition, should there be fewer that 2,689,840 approved base fund claims, the certificates remaining will spill over into the supplemental fund.

The determination of whether a subclass is necessary lies within the sound discretion of the Court. *Johnson v. American Credit Co. of Ga.*, 581 F.2d 526, 532 (5th Cir.1978). Using the provisions set forth in Rule 23, Armstrong appears in this litigation to object to the approval of the proposed settlement and all of Armstrong's concerns are products of the settlement agreement itself. Armstrong has availed itself of the objection process and vigorously represented the interest of the subclass that it seeks to certify. A subclass designation at this juncture would not improve Armstrong's position with regard to allocation. The Court finds that Armstrong has neither proven inadequate representation nor shown the need for a subclass. Given that the issue to be decided is the overall fairness of the settlement to the class, and given that these claimants, who choose not to opt-out, submitted their objections for the Court's consideration, the Court can find no reason to certify a subclass at the approval stage.

The Court is equally unimpressed with Armstrong's argument regarding allocation. Their primary argument lies with the proportionate allocation of the certificates between leisure and business travellers. But

> disagreements over the proposed division of a settlement fund do not necessarily create conflicts of interest requiring separate representation.... Such rules would place substantial burden on the settlement process. The court's principal obligation is simply to insure that the fund distribution is fair and reasonable to all participants in the funds.

*Walsh v. Great Atl. and Pac. Tea Co.*, 726 F.2d 956, 964 (3d Cir.1983). Armstrong contends corporate purchasers deserve subclass treatment not because they suffered a different type of damages than other class members but because they claim to have suffered more of the same. As the court noted in *Curtiss–Wright Corp. v. Helfand*, the very nature of a class action requires the settlement of disputes regardless of unanimity. "[When] a district judge approves a class action settlement pursuant to Rule 23(e), he almost always overrides the wishes of some class members for a bigger share of the pie." 687 F.2d 171, 175 (7th Cir.1982).

In support of its allocation argument, Armstrong insists that the settlement abandons the formulas presented to the Court at class certification by Dr. Beyer under which damage calculations were tied to a class member's aggregate purchases during the relevant period. Armstrong argues that the base fund distribution plan under the settlement treats the one-time flyers as equivalent to the nine-time flyers rather than compensating a class member based on the aggregate amount of purchases. Similarly, Armstrong argues, the proposed supplemental fund contains approximately one-third of the entire funds available to class members despite the fact that corporate class members who are relegated to the supplemental fund account for over fifty per cent of airline revenue during the class period and forty per cent of the travelers.

The parties report that in shaping the allocation of the settlement, they sought to assure a modest minimum participation level for each claimant. They were concerned that if the settlement were structured so that distribution of proceeds would be strictly on a pro rata basis, the amount of certificates distributed would have been de minimis, undermining the goal of the class action which was to provide a remedy for the small claimant. Conversely, the parties concluded that a total per capita distribution would have been unfair to large claimants. As an equitable solution, the base fund is to be divided among all claimants on a per capita basis, principally to accommodate the small, largely discretionary traveler. The supplemental fund, to be divided pro rata based on size of claims, is largely geared toward the more frequent, predominantly business traveler. The Court finds the allocation of the proceeds so as to provide a meaningful recovery to all class members is "rationally based on legitimate considerations." *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir.1983).

In any event, the claims filings to date demonstrate that corporate purchasers will recover roughly proportionately to the amount of their purchases. As of December 16, 1992, some 1,023,653 class members had filed supplemental fund claims. Defendants'

Response to Post–Hearing Memorandum of Armstrong and CPAT, filed December 21, 1992, at 3. Each of these claimants will participate in the per capita distribution of the base fund at an anticipated level of approximately $100 per claim, which represents a total base fund distribution to the supplemental fund claimants of approximately $102.4 million. When that $102.4 million is added to the $128 million supplemental fund, based on the present rate of filings, at least $230.4 million or fifty-eight per cent of the $396.5 million combined total fund will be distributed to business-oriented, supplemental fund claimants. While Armstrong refers to such calculations as "magic math," the Court finds that these preliminary calculations based on filings to date support the parties' position that a combined per capita and pro rata allocation is necessary to ensure meaningful participation by all class members in the distribution of the settlement. Were the parties to alter the allocation in the manner urged by Armstrong, the Court would surely be considering objections voiced by less frequent travelers that they were receiving a de minimis share of the settlement. In addition, unlike the leisure travelers, the corporate claimants enjoy a relationship with the carriers that invites negotiations to increase the use and benefit of the certificates. The Court finds the allocation between the base and supplemental fund is fair and reasonable for the class as a whole.

Armstrong also argues that there is substantial risk of duplicate recovery created when reimbursed purchasers and actual purchasers attempt to file claims for the same class flights. The notice is clear that a party reimbursed for class travel pursuant to a pre-existing agreement is not the proper claimant and that claimants are required to certify under penalty of perjury that they are the direct purchasers. In addition, the informational program to be released in conjunction with this order and approved by the Court reiterates and clarifies who is the proper purchaser for claims filing purposes. Form B and C claims will also be reviewed

during claims administration to determine whether the claimant is the proper purchaser. It is the responsibility of business claimants to inform their employees of the purchaser limitations. The Court finds that reasonable and adequate safeguards have been instituted to ensure against duplicate recovery.

Finally, Armstrong insists that the settlement will be fair only if defendants agree to provide rebates or credits to large purchasers instead of hundreds of individual certificates. The Settlement Administration Committee has indicated that while rebates and credits will not be given corporate claimants in lieu of certificates, "[n]othing precludes individual claimants from undertaking to negotiate with individual carriers for other arrangements." Report and Recommendation of the Settlement Administration Committee, filed January 15, 1993, at 5. While the method of distribution may not be the most convenient for all class members, the use of certificates is practical and easily tracked. The Court finds that the method of distribution of the settlement does not affect the fairness of the settlement.

### (n). *State Attorneys General*

Twenty-five states have filed objections to the settlement on behalf of natural persons in those states. There are also a few objections filed by states on behalf of the state government as non-class members objecting to the exclusion of governmental entities from the class definition.[63] The Court will first examine the government objection to the scope of the class definition and will then examine the objections to the fairness of the settlement filed by the states in their parens patriae capacity. The Court concludes, however, that these objections do not weigh against approval of the settlement.

■ Objections brought by government entities on their own behalf regarding the scope of the class definition raise an issue that has no relevance to the fairness of the settlements to the class. Because the government entities are not within the definition

---

**63.** *See, e.g.,* Objection of the State of Oregon, By and Through Its Attorney General, as *Parens Patriae* on Behalf of Natural Person Residents of the State of Oregon (the "Oregon Objection");

Statement of Objections to Proposed Settlements by the Port Authority of New York and New Jersey, August 28, 1992.

of the class and are not appearing on behalf of class members with regard to this objection, they have no standing to bring the objection. *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir.1989) ("The plain language of Fed.R.Civ.P. 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 660, 673 (M.D.Ala.1988) (where objectors argued that they should be included as members of the class, court held that they were without standing to object to the settlement and are not barred or affected by it); *Liddell v. Missouri*, 731 F.2d 1294, 1315 (8th Cir.1984) (where the state was "not a party to the settlement agreement, it thus lack[ed] standing to question the validity of the agreement or its terms"); *In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 754 (D.C.N.Y.1985) (objectors who were not misled sellers or purchasers of securities did not have standing to sue under 1934 Act, were therefore not members of the class and had no standing to object); *Seiffer v. Topsy's Int'l, Inc.*, 70 F.R.D. 622, 627–28, nn. 5, 6 (D.Kan.1976) (objectors lacked standing to object to settlement agreement because they were not members of the class).

The Consolidated Second Amended Complaint and both the certified litigation and settlement classes defined a class of ticket purchasers that excludes governments. Indeed, private class actions traditionally exclude governmental bodies, and neither party supported including government entities in the class definitions. Thus, at no time did any governmental entity have any reason to rely on these proceedings. As non-class members, no governmental agency will be bound by any final judgment or release in this matter. Moreover, nothing precluded governmental entities from bringing their own antitrust actions against the airlines, and nothing precludes them from doing so now. In fact, shortly after August 7, 1991, the date of the litigation class certification order, several state attorneys general became aware of these proceedings, yet did not ask to participate. *See* Affidavit of Pitts Carr, Exhibit 7 to Plaintiffs' Response to Objections to the Proposed Settlement, filed October 9, 1992. These objectors have not persuaded the Court that they should be permitted to object to the class.

In their parens patriae capacity, the Attorneys General object to several aspects of the proposed settlement. They contend that the settlement is underfunded for the number of class members who will likely file claims, and they object to the aggregation limitation on the use of the certificates, the use of blackout periods, and other limitations on redeemability.[64] At the Fairness Hearing, counsel appearing on behalf of several Attorneys General also argued that the restrictions placed on the use of the certificates transform the settlement into a promotional plan aimed at class members. With the exception of the state of Oregon, however, the Attorneys General do not object to the use of discount certificates as a form of settlement. Finally, the Attorneys General contend that notice to the class was inadequate. The Court concludes that these objections do not support disapproval of the settlement.

The objection of the Attorneys General to the amount of the settlement fund reveals a fundamental misunderstanding of this litigation. Utilizing statistics for the number of all domestic tickets sold from 1988 to 1991, the states have estimated a potential class of 208,721,875 claimants. Not even the defendants in their attempts to defeat class certification estimated so large a class and the parties agree that the class size is between twelve and fifty million. The Attorneys General erroneously equate the number of tickets sold with the number of travellers, ignoring the fact that most class-members have travelled more than once during the class period and that the class consists of purchasers rather than travellers.

**64.** The Attorneys General argued that the certificates should be cross-redeemable on non-defendants' airlines. This concern was resolved at the Fairness Hearing when Alaska Airlines announced that it had reached an agreement with the parties that other airlines may agree to redeem certificates. In addition, the certificates to be issued shall indicate in the legend that "Alaska Airlines has agreed to redeem these certificates. Other airlines may agree to redeem these certificates. Check with your travel agency or your preferred air carrier." Transcript at 165.

█ Equally puzzling is the assertion by the Attorneys General that the class notice was inadequate. The state Attorneys General base their notice objection solely upon the fact that one attorney, who obviously has received notice of these proceedings by publication, did not receive a class notice by mail.[65] This one absurd example does not provide a basis upon which to find that notice to the class was inadequate. Likewise, the Court finds that the Attorneys' General argument against aggregation and likening the settlement to a promotional campaign offer no new evidence against approval on these grounds.

The Attorneys General also argue that the two limited blackout periods for the use of settlement certificates deprive many class members of a benefit at "the precise time" they may have been injured and are most likely to travel. This statement is based on the affidavit of one attorney who wants to redeem her certificates during the blackout period. This argument ignores the fact that a class member can assign her claim to someone else for value or allow other members of her family to use the certificates.

The Court notes that not one state in its parens patriae capacity has commenced its own antitrust action against the airlines or attempted to intervene earlier in this case. As the Second Circuit explained in *Detroit*,

> In general, the position taken by the objectors is that by merely objecting, they are entitled to stop the settlement in its tracks, without demonstrating any factual basis for their objections, and to force the parties to expend large amounts of time, money and effort to answer their rhetorical questions, notwithstanding the copious discovery available from years of prior litigation and extensive pre-trial proceedings. To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process.

*Detroit*, 495 F.2d at 464. Most of the objections advanced by the Attorneys General represent a misunderstanding of the terms of

the settlement. In any event, the Court concludes that objectors present no factual basis supporting their complaints.

### (o). *James Morici, et al.*

Several individuals who are plaintiffs in class actions pending in Illinois state court (the "Chicago plaintiffs") object to the settlement, claiming that at least some of the claims asserted in the Chicago cases will be finally determined and released by these proceedings. The Chicago plaintiffs insist that the settlement cannot be approved because plaintiffs' counsel were unaware of the existence of the Chicago claims when negotiating the settlement, because the non-Chicago class members have a conflict of interest with the Chicago plaintiffs, and because the class notice was insufficient notice of the broad-based release defendants insist upon.

The original Chicago action was filed in 1988 against United, American, and Delta, and the complaint was later amended to add a number of other airlines, including Northwest. A motion to dismiss on behalf of all defendants was granted with leave to amend in 1989. The second amended complaint was filed in August of 1989 against United, American, and Northwest seeking damages based on claims of common law misrepresentation. The Chicago plaintiffs alleged that certain airlines charged passengers enplaning in Chicago on flights originating in Chicago a jet fuel tax surcharge that far exceeded the amount of tax levied by the City. In June of 1991, the Chicago plaintiffs filed an identical class action complaint on behalf of a different plaintiff against Delta. The actions were removed to federal court and later remanded. On September 2, 1992, the state court certified a class in the action against United, American, and Northwest consisting of individuals who purchased tickets for travel from Chicago from May 1, 1987, through December 1, 1987. No class has been certified in the action against Delta.

Following discovery, the Chicago plaintiffs amended their complaints in February 1992 to broaden their challenge beyond the origi-

---

**65.** In any event, there is no requirement that notice reach 100% of the class, rather, the parties need give only the best notice practicable under the circumstances of each case. *See* Fed. R.Civ.P. 23(c)(2).

nal retroactive surcharge. By amendment, the Chicago plaintiffs alleged for the first time, among other things, that a smaller surcharge included in the defendants' Chicago-originating published fares since January 1, 1988, was the product of a conspiracy to artificially fix airline fares in violation of Illinois antitrust law.[66] By the time the new allegations were advanced, Northwest had already negotiated its settlement in this case. In April 1992, Northwest filed its answer to the recently amended class action complaint in the Chicago action asserting as an affirmative defense:

> To the extent that the Third Amended Complaint seeks to certify a class that includes passengers who purchased domestic airline passenger tickets from Northwest Airlines, Inc. for flights originating from Chicago during the period January 1, 1988, to the present, the claims of such punitive class members are barred, in whole or in part, by the class certification order and preliminarily approved settlement in *Domestic Air Transportation Litigation.*

Defendants' Supplemental Brief in Response to Objections of Chicago Plaintiffs, filed October 16, 1992, Exhibit C—Answer of Defendant Northwest Airlines, Inc. to Plaintiffs' Third Amended Class Action Complaint, Twelfth Defense, p. 15. The remaining defendants in the Chicago action, American, Delta, and United, also pled the instant action as an affirmative defense.[67] The actions were again removed to federal court in March 1992 and remanded in September of the same year.

The release contained in the settlement provides:

> In full and complete settlement and release of all claims of the plaintiffs and members of the Settlement Class that are

or could have been alleged in the Second Amended Consolidated Class Action Complaint or in any prior complaint in the Actions and that arise out of, or are related to, the conduct, acts, subject matter or any conspiracy alleged in any such complaint or out of any alleged act in furtherance of any such alleged conspiracy, including, without limitation, all claims under federal and state antitrust and unfair competition laws for damages resulting from alleged overcharges with respect to ticket purchases made at any time in the past through entry of a final judgment.

The Chicago plaintiffs argue that the settlement is unfair if it releases any or all of their state law claims in the Chicago litigation, as defendants insist. They contend that plaintiffs in the present action did not negotiate or receive any value for the Chicago claims, failed to allocate any portion of the settlement to the Chicago plaintiffs, and were not authorized to represent any of the Chicago class members with regard to their unrelated claims.

 This Court lacks jurisdiction to decide whether the claims now being settled, once finally dismissed, are *res judicata* as to the claims asserted by the Chicago plaintiffs: that issue can be decided in any binding manner only by the court having jurisdiction over the Chicago action. *See* Order dated August 31, 1992. Nonetheless, having heard from all parties repeatedly on this matter and having reviewed extensive briefs on the issue, for the purpose of determining the fairness of the settlement, the Court finds that the release given the class plaintiffs here does not bar any aspect of the cases pending in Chicago.

While certain defendants now take the position that the release in this case bars the

---

**66.** The amended complaints also contained counts charging the violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, and common law fraud and deceit.

**67.** For example, Delta's answer in the Chicago litigation, which was filed on April, 16, 1992, included the following affirmative defense:

> Insofar as the alleged class sought to be certified by plaintiff includes claims for damages based on airlines tickets for travel on Delta and other airlines purchased after December 31,

1987, the claims of the plaintiffs are the subject of a prior pending action in on-going multidistrict proceedings in the United States District Court for the Northern District of Georgia, Atlanta Division.

Defendants' Supplemental Brief in Response to Objections of Chicago Plaintiffs, filed October 16, 1992, Exhibit D—Answer of Defendant Delta Airlines to Amended Class Action Complaint, Eleventh Defense, p. 18.

Chicago claims, defendants' actions throughout this litigation contradict their newly advanced argument to that effect. *See* Supplemental Brief of Delta Air Lines, Inc. in Opposition to the Objections of the Chicago Plaintiffs, filed November 9, 1992. The present litigation is composed of twenty-one consolidated cases, the majority of which were transferred to this Court by the Judicial Panel on Multidistrict Litigation. It is hard to conceive of a federal court antitrust case that would fall within the terms of the release given here that would not also fall within the definition of a "tag-along" case under the Rules of Procedure of the Multidistrict Panel requiring identification and transfer of similar actions to this Court.[68] Defendants, however, at no time identified the Chicago cases as tag-along cases to this multidistrict proceeding under the Rules of the Multidistrict Panel. If the Chicago claims are the same as those claims transferred to this Court, the defendants had a duty to act under Rule 13(e) of the Panel and ask that the Chicago claims be transferred to Atlanta. Defendants' failure to do so is evidence that defendants do not believe that the claims in the Chicago litigation involve common questions of fact with the actions transferred by the Panel to this Court and thus are not encompassed by the release here.

Moreover, at no time before entering into the settlement agreement did defendants' counsel[69] inform plaintiffs' counsel of the pendency of the Chicago cases. Plaintiffs' counsel in the present action have acknowledged that they were unaware of the pendency of the Chicago litigation during settlement negotiations and that "it was neither discussed nor considered in any of the meetings resulting in the settlement agreement." Letter from Pitts Carr, dated August 18, 1992, attached as Exhibit 3 to Objection of Chicago Plaintiffs filed September 4, 1992; Transcript of Hearing on Emergency Motion to Vacate Preliminary Approval of the Settlement, August 19, 1992, at 29–30. Negotiating a release of claims is a primary objective for a defendant in a complex and far-reaching action such as the present litigation. Logic and the interests of preserving arms' length bargaining dictate that competent counsel would have discussed any questionable or unique implication of the instant release with plaintiffs' counsel. The Court finds that the release of the Chicago claims was not the intent of defendants but a fortuitous afterthought.[70]

■ Even if a court of competent jurisdiction were to find that the Chicago claims fall within the release, this Court still finds that the settlements are nonetheless fair, reasonable, and adequate under the circumstances. This follows from the Second Circuit's analysis in *National Super Spuds Inc. v. New York Mercantile Exch.*, 660 F.2d 9 (2d Cir.1981), a case upon which the Chicago plaintiffs inappropriately rely. The class in *Super Spuds* consisted of members who as of a certain time had liquidated or closed out positions that they held in the potato futures market. The objector to the settlement in the case was a member of the class of people who had liquidated or closed out positions, but, in addition, this objector also had commodity positions in potato futures that he had not closed out or liquidated by the class cut-off date and as to which he was asserting a separate claim. According to the *Super*

---

**68.** Rule 13 of The Panel's Rules of Procedure requires counsel in actions transferred to notify the Clerk of the Panel of any potential tag-along actions in which that party is also named or in which counsel appears. "Any parties in actions previously transferred under section 1407 or under consideration by the Panel for transfer under section 1407 shall notify the Clerk of the Panel of any potential "tag-along actions" in which the party is also named." Rules of Procedure, J.P.M.L. 13(e). The rules define "tag-along actions" as a civil action pending in any district court that involves common questions of fact with the transferred action.

**69.** Many of the defendants are represented by the same counsel in the Chicago litigation as in this litigation.

**70.** The release language of the Settlement Agreement here does not encompass the Chicago claims under the Illinois Consumer Fraud Act and certainly not the Chicago state law claims for fraud, deceit, or misrepresentation. Even if the Chicago cases do articulate antitrust claims encompassed within the release in this case, the state law claims in Chicago for fraud and misrepresentation, upon which that case was originally brought, would nonetheless remain, and the plaintiffs are not deprived of relief and therefore prejudiced by these settlements.

*Spuds* defendants, however, the release in the class action foreclosed those claims with respect to the unliquidated open positions as well. The issue before the court was whether a settlement containing such a release could be approved under Rule 23(e). In concluding that the *Super Spuds* settlement could not be approved with such a release, the court addressed three issues it believed to be determinative of this question. *Id.* at 14. An analysis of these three issues supports approval of the instant settlement.

The *Super Spuds* court first found that the objector did not receive notice that his claims were being released since no mention was made in the official notice of the provision in the settlement agreement barring all claims of class members whether asserted in the underlying action. *Id.* Unlike the claimant in *Super Spuds,* the Chicago plaintiffs here received adequate notice that their state claims were encompassed within the release. The notice of the release terms indicated:

> The proposed settlements are intended to settle all claims against the Settling Defendants under federal or state law that members of the class have alleged or could have alleged in the lawsuit or that arise out of any alleged act in furtherance of the alleged antitrust conspiracy, including any claims for damages resulting from alleged overcharges with respect to tickets purchased at any time in the past.

The Chicago plaintiffs insist that this notice was inadequate to apprise potential class members in the Chicago action of the release of their claims. The Court finds the Chicago plaintiffs' argument disingenuous: the plain language of the notice of release clearly indicates the possibility of the release of any state claims.

Second, the *Super Spuds* court determined that the objector, while releasing claims for open positions, was precluded from making a claim against the settlement fund for the same positions. In the instant action, because Chicago is a hub that falls within the ambit of the settlement, the Chicago plaintiffs can claim against the settlement fund with respect to any ticket purchased for a flight originating in Chicago, including flights to which the alleged conspiratorial surcharge

alleged by the Chicago plaintiffs was applied. Finally, unlike the plaintiffs in *Super Spuds,* class plaintiffs in the present action clearly had the power to extinguish claims such as those brought in the Chicago litigation as part of the settlement of these multidistrict proceedings. *See Olmstead v. Amoco Oil Co.,* 725 F.2d 627 (11th Cir.1984).

The Chicago plaintiffs could have opted out of these settlements. Not having done so, it is not unfair to limit their recovery to the settlement proceeds.

> Plaintiffs had an opportunity to opt out of the class and litigate their state claims in state court; more pertinent, they knew that the settlements compromising class members' state claims had been negotiated before they were asked to opt out. Plaintiffs, however, wanted to participate in the class, share the fruits of the class' settlement negotiations, and still be free to litigate their state claims. In short, the objectors felt entitled to the bird in the hand while pursuing the flock in the bush. If the objectors felt they could do this, that was their prerogative but in doing so they accepted the risk that they would be precluded.

*In re Corrugated Container Litigation,* 643 F.2d 195, 222 (5th Cir.1981). The only issue therefore becomes whether the proposed settlement is fair, adequate, and reasonable. The only reason it would not be is if the Chicago originating flights subject to the Illinois litigation are entitled to some disproportionate share of the settlement recovery because of the fuel surcharge. The Chicago plaintiffs, however, have made no such demonstration. The evidence accumulated by plaintiffs, on the other hand, shows not only systemwide price increases through the ATPCO system but also increases that were specific hub- or route-oriented. Moreover, data on Chicago fares, including the increase in fares due to the jet fuel surcharge, were part of the database used by plaintiffs' expert, Dr. John Beyer, who concluded that there would be a uniform minimum overcharge across the class. Therefore, the Court finds no evidence that the Chicago originating flights would be entitled to any disproportionate share of the recovery and thus no basis to conclude that the settle-

ments are other than fair, reasonable, and adequate to the class.

The objections reviewed by the Court represent the entire range of attacks made on the settlement in all of the objections filed with the Court. In light of the Court's determination on the other factors bearing on approval, the recommendation of counsel, and the fact that no evidence or expert testimony was presented by any objectors demonstrating the inadequacy or unfairness of the settlement, the Court finds the number and substance of the objections legally insufficient to warrant disapproval of the settlement. *See In re Dennis Greenman Sec. Litig.*, 622 F.Supp. 1430, 1443 (D.C.Fla.1985).

## V. *CONCLUSION ON SETTLEMENT APPROVAL*

In sum, the Court has determined that the settlement has been achieved in good faith through arms' length negotiations and is not the product of fraud or collusion. Plaintiffs face significant obstacles to the further success of their action that quite probably would result in no recovery for the class. Moreover, the settlement offers substantial benefit to the class and amounts to a reasonable percentage of the possible recovery in this matter. Continued litigation would result in the largest antitrust trial in history at great expense and drain on judicial resources. Furthermore, the objectors represent a very small percentage of the class and their arguments are legally insufficient to require disapproval. The parties have met their burden and presented evidence of the fairness of the settlement and there exists an adequate basis on the record from which to evaluate the settlement. Accordingly, the Court finds that the settlement is fair, adequate, and reasonable and that approval is in the best interest of the class.

## VI. *ATTORNEYS' FEES*

Having approved the settlement in this action, the Court must now consider the Joint Application of Plaintiffs' Counsel for the Award of Attorneys' Fees, Reimbursement of Expenses, and Award to Class Plaintiffs. Several objectors have also filed petitions for reimbursement of fees and ex-

penses. The Court is guided in its determination of an appropriate fee award by the benefit that counsel have obtained for the class, as well as by the risks associated with pursuing the action and the actual hours and expenses invested in the case. Class counsel request attorneys' fees of 5.25% of $458 million, their estimation of the total value of the settlement, which amounts to $24 million, expenses of $1,634,254.26, and awards to class plaintiffs totaling $142,500.

While the Court finds that the benefit to the class of the settlement is substantial, it does not agree with plaintiffs that the economic value to the class of the settlement from which to calculate the appropriate fee is equivalent to the face value of the certificates plus the cash fund. After adjusting the value of the common fund to account for the likely redemption rate of the certificates, the Court finds that an award of attorneys' fees to the thirty-seven law firms that served as plaintiffs' counsel over the past three years of $14,378,245.74 million and expenses of $1,634,254.26 is fair and adequate compensation for the considerable effort expended by counsel in this action. This award amounts to 5.25% of $305 million, the median value in the range of values of the settlement determined by the Court. The Court also approves awards to representative class plaintiffs of $142,500.

In reaching its conclusions on an appropriate fee award, the Court will first examine the relevant legal precedent for fee awards in class actions of this type and will review the fee petition utilizing the common fund method. To assist in determining an appropriate percentage award, the Court will also review the petition using the lodestar method. Finally, the Court will examine the individual fee applications filed on behalf of several objectors.

## A. *The Appropriate Method of Calculating A Fee Award*

The prevailing rule in the United States is that all parties are to bear their own costs in litigation. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). One of the recognized exceptions to the no-fee rule

is the "common fund" case.[71] Under this exception, class counsel are entitled to compensation for their services where a common fund is created by their efforts. *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir.1991). This exception "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). Furthermore, courts have also recognized that in order to encourage "private attorney general" class actions brought on behalf of persons with small individual losses, a financial incentive is necessary to entice qualified attorneys to devote their time to complex, time-consuming cases for which they may never be paid.

[T]he financial incentive that class actions offer to the legal profession is a natural outgrowth of the increasing reliance on the "private attorney general" for the vindication of legal rights; obviously this development has been facilitated by Rule 23. . . . Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, persons may be without any effective redress unless they employ the class action device.

*Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338–39, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980).

The Eleventh Circuit has made it clear that in cases where the actions of counsel have resulted in the establishment of a common fund for the benefit of the class, attorneys' fees should be calculated as a reasonable percentage of the common fund.[72]

---

**71.** There are four major exceptions to the no-fee rule: (1) common fund; (2) substantial benefits conferred; (3) statutory authorization; and (4) sanctionable behavior. Herbert B. Newberg, *Attorney Fee Awards* § 1.01 (1986).

**72.** There has long been a debate over the appropriate method of calculating a common fund fee award. In the first Supreme Court case recognizing counsels' claim to fees payable out of a common fund created by their efforts, the fee award was based on a percentage of the fund recovered for the class. *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 127–28, 5 S.Ct. 387, 392–93, 28 L.Ed. 915 (1885). Thereafter, from 1885 to 1973, common fund fee awards were left to the court's discretion, with the only standard being what was reasonable under the particular circumstances of the case. *Camden I*, 946 F.2d at 771. In 1973, in order to provide reviewable findings and to insure that attorneys would be compensated for the reasonable value of their time, the Third Circuit established a prescribed set of guidelines that courts in that circuit must consider in determining a common fund fee award. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973). Under the *Lindy* "lodestar" approach, the district court must first determine the number of hours reasonably spent on the matter and then multiply the hours by a rate that the court finds reasonable for similarly complex, non-contingent work. The lodestar figure may then be adjusted upward or downward for certain multiplier factors, such as contingency and quality of work performed. *Id.* at 166–68.

At approximately the same time as the *Lindy* decision was rendered, the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), adopted a twelve-factor method for determining court-awarded attorneys' fees. The twelve *Johnson* factors are:

 (1) the time and labor required;
 (2) the novelty and difficulty of the questions involved;
 (3) the skill requisite to perform the legal service properly;
 (4) the preclusion of other employment by the attorney due to the acceptance of the case;
 (5) the customary fee;
 (6) whether the fee is fixed or contingent;
 (7) time limitations imposed by the client or the circumstances;
 (8) the amount involved and the results obtained;
 (9) the experience, reputation, and ability of the attorneys;
 (10) the "undesirability" of the case;
 (11) the nature and the length of the professional relationship with the client;
 (12) awards in similar cases.

*Id.* at 717–19. Although *Johnson* was a statutory fee award case, it has been considered outside the realm of statutory fees. *See e.g.*, *Hoffert v. General Motors Corp.*, 656 F.2d 161 (5th Cir. Unit A 1981), *cert. denied*, 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982). The Eleventh Circuit recently noted that the *Lindy* lodestar approach subsumes several of the *Johnson* factors and has refined its analysis for determining statutory fee awards in favor of the lodestar approach. *Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th Cir.1988). In *Camden I*, the 11th Circuit clarified that regardless of the approaches provided in *Lindy* and *Johnson*, the lodestar and twelve-factor methods are inappropriate as a basis for computing common fund awards. 946 F.2d at 773. Instead, the "analysis in common fund cases focuses not

*Camden I*, 946 F.2d at 774. While the percentage of a common fund which may reasonably be awarded as a fee varies, the court in *Camden I* noted that "[t]he majority of common fund fee awards fall between 20% and 30% of the fund," with an upper limit of 50%. *Id.* This benchmark percentage, however, should not be applied mechanically. In determining the appropriate percentage for calculation of a fee award in a common fund case, the Eleventh Circuit directed that the court should review the factors articulated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).

> [T]he *Johnson* factors continue to be appropriately used in evaluation, setting, and reviewing percentage fee awards in common fund cases. Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms of the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action. In most instances, there will also be additional factors unique to a particular case which will be relevant to the district court's consideration.

*Camden I*, 946 F.2d at 775 (citations omitted). The prevailing determinant of the fee to be awarded is the measure of the recovery achieved by counsel. *Id.* at 773.

Accordingly, the Court will utilize the percentage of the fund approach to examine class counsels' pending fee application. In selecting an appropriate percentage award the Court will review the measure of the recovery as well as evaluate the action using the lodestar fee, relevant *Johnson* factors, and other factors unique to this case.

### B. Determination of the Appropriate Percentage of the Common Fund to be Awarded as a Fee

██ The Joint Petition of Plaintiffs' Counsel describes in detail the history of the litigation and the work performed by counsel. The petition and its amendments include affidavits from the thirty-seven law firms that served as plaintiffs' counsel.[73] The total amount charged for the hours worked is $7,866,298.70 and the sum of expenses for which reimbursement is requested is $1,634,254.26, for a total of fees and expenses of $9,500,552.96.[74] Counsel request a fee award of $24 million, expenses of $1,634,254.26, and awards to named class plaintiffs which total $142,500. Class counsel argue that the attorneys' fee request is reasonable under *Camden I* in that it equals 5.25% of the total value of the settlement, well below the typical award of 20–30% in common fund cases.

While the benchmark for a percentage award in a normal common fund case falls between 20–30%, the present action is an exception to the typical common fund case because of the size of the recovery. In announcing the 20–30% benchmark, the Eleventh Circuit in *Camden I* cited with approval Newberg's *Attorney Fee Awards*, which analyzes the range of awards in common fund cases. Newberg recognizes that when the fund is extraordinarily large, the application of a normal range of fee awards may result in a fee that is unreasonably large for the benefits conferred. Thus, based on empirical research covering settlements as late as 1991, Newberg notes that percentage awards tend to decline as the size of the recovery increases. Herbert P. Newberg, *Attorney Fee Awards* § 2.09 (1986). Where fund re-

---

on the plaintiffs' position as 'prevailing parties,' but on a showing that the fund conferring a benefit on the class resulted from their efforts. In this context, monetary results achieved predominate over all other criteria." *Id.* at 774. The lodestar and *Johnson* factors remain useful in common fund cases only to the extent that they impact on the appropriate percentage to be awarded in a particular case. *Id.* at 775.

**73.** To facilitate the efficient progression of the action the Court appointed a 13–member plaintiffs' Steering Committee early in the litigation to execute the orders of the Court and to coordinate the initiation and conduct of discovery. In addition, the Court designated four of the Steering Committee members to serve as co-lead counsel responsible for the day-to-day supervision of the litigation. Finally, a liaison counsel was appointed as spokesperson for the plaintiffs. Pretrial Order No. 2, dated December 21, 1990.

**74.** The total number of hours expended on the case by plaintiffs' counsel was 43,462.8. This figure includes 31,683.40 attorney hours and 12,049.40 paralegal hours.

coveries range from $51–$75 million, fee awards usually fall in the 13–20% range.[75] In megafund cases where extraordinarily large class recoveries of $75–$200 million and more are recovered, courts most stringently weigh the economics of scale inherent in class actions in fixing an appropriate per cent recovery for reasonable fees. *Id.* Accordingly, fees in the range of 6–10% and even lower are common in this large scale context.[76]

The Court finds that a reduced percentage award of fees and expenses of 5.25% is appropriate in this action given the size of the recovery. The percentage recommended by counsel is in line with precedent and represents reasonable compensation for counsels' considerable efforts on behalf of the class. As noted earlier, however, the Court does not agree with counsels' assertion that the value of the settlement from which to calculate the award is equal to the face value of the discount certificates plus the cash fund. Rather, the value of the common fund from which to calculate a percentage fee award amounts to between $254 and $356 million with a median value of $305 million. *See supra* pp. 319–323. Thus, 5.25% of the median value in the range amounts to an award of attorneys' fees of $14,378,245.74 million and expenses of $1,634,254.26.[77]

The Court finds that, given the necessary adjustment to the economic value of the certificates to account for the likely redemption rate, a fee award of approximately $14.3 million is fair compensation for the benefits conferred.[78] The Court will examine the factors supporting this percentage award, including relevant *Johnson* factors and the lodestar fee, in its discussion below.

### 1. *The Results Achieved*

■ The most important element in determining the appropriate fee to be awarded class counsel out of a common fund is the result obtained for the class through the efforts of such counsel. In the instant case, the Court has approved a settlement in which class counsel created a cash fund of $50 million and a fund of travel certificates valued by the Court to be $254–$354 million. The Court also found that the settlement provides substantial benefit to the class and adopts its earlier findings concerning the value of the settlement. Counsel negotiated a significant settlement for the class in light of the precarious financial position of most of the defendants and over defendants' insis-

75. *See, e.g., In re Workers' Compensation Ins. Antitrust Litig.*, 771 F.Supp. 284 (D.Minn.1991) ($50 million class recovery, fee of 22.5% or $11.25 million awarded); *In re Fernald Litig.*, No. C–1–85–149, 1989 WL 267038 (S.D.Ohio 1989) ($73 million class recovery, fee of 20% or $15.5 million awarded); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451 (10th Cir.), *cert. denied*, 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) ($75 million class recovery, fee of 16.5%); *In re Flight Transp. Corporate Securities Litigation*, 685 F.Supp. 1092 (D.Minn.1987) ($52 million class recovery, fee of 15% awarded); *In re Gypsum Cases*, 386 F.Supp. 959 (N.D.Cal.1974) ($75 million class recovery with interest, fee of 12.35% awarded), *aff'd* 565 F.2d 1123 (9th Cir. 1977).

76. *See, e.g., In re Folding Carton Antitrust Litig.*, 84 F.R.D. 245 (N.D.Ill.1979) ($200 million class settlement in antitrust price-fixing suit, 6.6% of fund awarded for fees); *In re Corrugated Container Antitrust Litig.*, 1983–2 Trade Cas (CCH) ¶ 65,-628, 1983 WL 1872 (S.D.Tex.1983) ($366 million class recovery, approximately 9% fees and expenses awarded); *Sioux Nation of Indians v. U.S.*, 650 F.2d 244, 227 Ct.Cl. 404 (1981) ($106 million class recovery, fees of 10% awarded); *In re MGM Grand Hotel Fire Litigation*, 660 F.Supp. 522 (D.Nev.1987) ($205 million plus interest class recovery, 7% fees awarded). *Cf. In re Plywood Antitrust Litig.*, MDL 159 (E.D.La.1988) ($171 million class recovery, fees awarded of 15% or $25.5 million); *In re Standard Oil Co./British Petroleum Litig.*, No. 126760 (Ohio 1987) ($618 million take-over enhancement for class, 3.5% fees requested and awarded or $22 million); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1296 (E.D.N.Y.1985) ($180 million class recovery, 5.5% fees awarded); *In re Baldwin–United Corp. Litig.*, 1986–1987 Fed.Sec. L.Rep. (CCH) ¶ 92,918, 1986 WL 12195 (S.D.N.Y.1986) ($183.8 million class recovery, 4.1% fees awarded out of 5% requested).

77. The fees award alone amounts to 4.71% of the median value of the common fund. The Court has chosen to include in its percentage award, however, an award of expenses accrued by counsel. *See Morganstein v. Esber*, 768 F.Supp. 725 (C.D.Cal.1991).

78. The award for fees and expenses amounts to between 4.5% and 6.3% of the entire range of approximate value of the settlement. Even using objector Hudders' unsubstantiated, conservative estimate of a 25% redemption rate, the award amounts to only 10.5% of the common fund, well below the 20–30% benchmark cited in *Camden I*.

tence that they could not provide a larger cash settlement. Were it not for the considerable skill and effort of plaintiffs' counsel, the action would never have been certified as a class action and members of the class would receive nothing in return for their claims against defendants. The settlement, even given its adjusted value, represents a meaningful recovery for the class. The Court finds that the results achieved by counsel support the percentage fee award in this action.

### 2. *The Time in Which the Result was Obtained*

Counsel achieved two settlement agreements early in this litigation and the remainder of the settlements occurred only after considerable litigation had taken place and the mettle of the plaintiffs had been tested. The final settlements were negotiated over a series of months. The parties concur that agreement was not easy and numerous offers and rejections, particularly concerning the conditions on the coupons, occurred before the final terms were approved by both parties.

For a class action of this size, this case has proceeded in a swift and efficient manner. Plaintiffs were granted class certification only ten months after the cases were transferred to and consolidated by this Court. The final settlements were reached eleven months later. Absent settlement, even had plaintiffs survived defendants' motion for summary judgment, the case would have proceeded to an extremely lengthy trial. The expenses incurred by the class would have multiplied and, if plaintiffs prevailed at trial, they faced a certain appeal. It is unlikely that a final result would have been achieved for several years. The Court finds that counsel achieved substantial results for the class in the most efficient manner possible after sufficient time to evaluate the strengths and weaknesses of plaintiffs' claims.

### 3. *The Non–Monetary Benefits Conferred Upon the Class*

*Camden I* authorizes consideration of any non-monetary benefits provided by the settlement. The certificate portion of the com-

mon fund has been calculated as a dollar equivalent; other non-monetary benefits conferred on the class by the settlement justify the enhancement of the Court's fee award. The Northwest settlement agreement contains further injunctive relief for the class and the other defendants have agreed to implement antitrust compliance programs which will help forestall antitrust violations in the future. The Court finds that these benefits support the percentage award made by the Court but do not justify the higher fee requested by class counsel.

### 4. *The Economies of Scale Involved in Prosecuting a Class Action*

*Camden I* also authorizes an examination of the economies of scale inherent in any class action in determining an appropriate fee award. *Camden I*, 946 F.2d at 775. Some courts have lowered fees to class counsel who achieved a quick result in a class action due to economies of scale, reasoning that there is little additional time or effort required to litigate a class action and that plaintiffs' attorney should not be allowed to receive a contingent fee payable out of the entire fund at the same rate that the attorney would receive on one claim. *Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 679, 695 (M.D.Ala.1988). The award in this action is not only well below the benchmark established by the Eleventh Circuit, but takes into consideration the fact that due to the economies of scale inherent in large class actions, the percentage fee awarded should be less than that awarded in other contingent fee cases and smaller class actions. Accordingly, an award of 5.25% of the common fund adequately accounts for the economies of scale in class actions of this size.

### 5. *Objections to the Settlement and Application for Fees*

Since notice of the present settlement was issued to the class, the resounding objection to approval of the settlement and to the application for attorneys' fees has been that this action merely amounts to a "lawyers' case" where counsel receive an exorbitant amount of cash while the class receives certificates of questionable value.[79] This objec-

---

79. *See, e.g.,* Response of Public Citizen, Ralph Nader, and Center for Study of Responsive Law

tion combined with the refrain that counsel should receive discount certificates instead of cash has widespread public appeal but totally ignores the value of the settlement and the financial incentive necessary to induce experienced and well-qualified counsel to take on complex and time-consuming cases for the benefit of the public and for which they may never be paid or even reimbursed for the considerable out-of-pocket expenses.

The Court previously found that the certificates offered in settlement represent substantial benefit to the class. As stated in its findings, the Court agrees that the value of the settlement is not the equivalent of the face value of the certificates. What plaintiffs did achieve, however, in negotiating the settlement was reasonable compensation for claims of arguable merit which would have been costly to pursue and difficult to prove. Counsel negotiated long and hard with defendants to achieve the most beneficial settlement for the class against defendants' steadfast refusal, based on their bleak financial positions, to provide a larger cash settlement. The results they obtained for the class are of significantly more value than any small cash settlement that defendants would agree to pay. Even if the cash award made by the Court today were cash available to the class, based on the claims filings to date, each class member would receive only $5.33.[80] In con-

trast, under the settlement as approved by the Court, each individual class member, however small her claim, will receive substantially more value in an award of certificates, even given the adjustment for redemption rates.[81]

Furthermore, it is unreasonable to suggest that class counsel who are faced with their own overhead expenses and other costs of doing business, after advancing millions to the class in pursuit of the action, should be relegated to a barter economy where they attempt to pay their employees with certificates. The purpose of awarding fees is to compensate successful attorneys for benefits they have achieved for the class as a result of the attorneys' efforts, for the risks the attorneys have taken in prosecuting a long and complex case, and for the hours and expenses the attorney has invested in the case. This purpose cannot be met by an award of fees in the form of certificates. The Court finds, however, that the purpose behind this antitrust class action, to provide a remedy for a violation of the antitrust laws, can be met by an award of valuable certificates to class members. *See In re Cuisinart Food Processor Antitrust Litig.*, M.D.L. 447 (D.Conn. May 31, 1984) (approving an award of cash fund to plaintiffs' counsel when class members received discount coupons).[82] The

---

to Joint Application of Class Counsel for an Award of Attorneys's Fees, Reimbursement of Expenses, and Award to Class Plaintiffs, filed September 15, 1992; Objection of Jane Simon, Inc. to Application for Attorneys Fees of Plaintiffs' Counsel, filed November 20, 1992. Only a few objectors filed formal objections to the attorneys' fees application and even fewer attended the hearing held on the application. Six objectors argued against the application for fees at the November 30, 1992, hearing on attorneys' fees.

**80.** As noted earlier, the class size in this action is estimated to be between 12 and 50 million. The number of claims filed is approaching 3 million and the recent extension of the claims filing date to June 1, 1993, is sure to increase the number of filed claims.

**81.** Class members claiming the purchase of up to 5 round trip tickets, Form A claimants, will receive certificates with a face value of up to $100 and an economic value of at least $50.

**82.** When states have litigated class actions and negotiated settlements involving coupons, they

have chosen to accept cash rather than coupons. For example, in *New York v. Nintendo of Am.*, 775 F.Supp. 676 (S.D.N.Y.1991), a recent settlement involving many of the states that have objected to the fee petition here, the settlement agreement called for purchasers of Nintendo products to receive coupons for $5 off the future purchase of Nintendo video game cartridges. *Nintendo*, 775 F.Supp. at 679. The state attorneys general, by contrast, received two cash payments under the settlement: $3 million for certain of the state purposes such as "antitrust enforcement" and $1.75 million for administrative costs, including the cost of notice and attorney fees. *Id.* The states did not receive any of their payments in the form of coupons. In addition, in the settlement of their claims in a recent fraud case, California and other states negotiated the award of $50 million in coupons to consumers who purchased certain auto repair services and the state received $3.5 million to cover the cost of its investigation and $1.5 million to finance auto repair training programs at California community colleges. *Baporia v. Sears, Roebuck & Company*, C–92–2341–RHS, U.S. District Court, Northern District of California.

Court agrees with objectors that the $24 million fee request is excessive in light of the reduction in value of the settlement and has reduced the fee accordingly. The Court, however, rejects the purely emotional and specious argument advanced by many that counsel should not receive a cash fee award.

There are two remaining primary objections to the application for fees. First, several objectors argue that the value of the settlement is significantly less than that used by class counsel to calculate their fee as a percentage of the common fund.[83] As stated earlier, the Court agrees that the parties' estimation of the settlement value is inflated and has adjusted the fee award consistent with its earlier findings concerning the value of the settlement. Objector Public Citizen also argues that insofar as the $50 million cash fund is to be used for payment of administrative expenses and attorneys' fees, that amount should not be included in the Court's calculation of the amount of the common fund. Whether the cash portion of the settlement is used to pay attorneys or to distribute certificates to class members, the expenditure of the fund inures to the benefit of the class. Accordingly, the Court rejects the argument that the calculation of the value of the common fund should exclude all cash used to pay attorneys' fees and the expenses of the claims administration.

The remaining argument advanced by several objectors is that the *Camden I* percentage of the common fund method is not appropriate in this case, but rather that because of the nature of the settlement, the Court should apply the lodestar approach in analyzing the fee application.[84] The Court finds that the Eleventh Circuit has spoken definitively on the method to be used in common fund cases and has directed that a modified lodestar and *Johnson* approach is appropriate only in statutory fees cases. However, in an abundance of caution and in order to provide readily reviewable findings, this Court deems it appropriate to review the award under the lodestar analysis with reference to relevant *Johnson* factors.

### 6. *Lodestar Analysis*

 Class counsel submitted affidavits demonstrating that as of November 6, 1992, they had spent an aggregate of 43,-732.80 on this matter amounting to 31,683.40 of attorney hours and 12,049.40 hours of paralegal time. In addition, administration of the settlement by plaintiffs will take hundreds, and possibly thousands, of additional hours. The first step in the lodestar analysis is to determine the reasonable rate and the reasonable hours that counsel are entitled to, taking into account various factors affecting the level of the fee awarded. The fee applicant must provide sufficient documentation of hours and rates for each activity.

The Court, either trial or appellate, is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may·form an independent judgment with or without the aid of witnesses as to value. *Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292 (11th Cir.1988). The Court will first examine counsels' accounting of hours and the rates charged before examining other factors that affect the lodestar determination.

### a. *Hours Reasonably Expended*

 In determining hours reasonably expended, the Court should exclude "excessive, redundant or otherwise unnecessary" hours regardless of the attorneys' skill, reputation or experience. *Norman*, 836 F.2d at 1301. At the onset of the litigation, the Court directed plaintiffs' Steering Committee to submit a uniform monthly report of time and expenses incurred in connection with the litigation. Pretrial Order No. 2, dated December 21, 1990, at 7. The Court reviewed each report on a monthly basis and monitored the

---

83. *See e.g.,* Objector Hudders' Comments on Plaintiffs' Counsel's Fee Request filed November 24, 1992; Objection of Public Citizen filed September 15, 1992. Many of these objections, however, were advanced prior to the elimination of the travel agent restriction from the settlement agreement.

84. *See e.g.,* Objection By General Motors, a Member of the Class, to Counsel Application for Attorneys' Fees, filed September 15, 1992; Supplemental Objections of Sandra Norris, et al. to Plaintiff Class Counsel's Joint Request for Award of Attorneys' Fees and Reimbursement of Expenses, filed November 17, 1992.

efforts of counsel throughout the course of the litigation. Class counsel report that in an effort to streamline pre-trial preparation and to guard against duplication of effort, work assignments were made among the various firms and work was supervised by co-lead counsel. Statement of Work Assignments filed January 12, 1993.[85] This is corroborated by the detailed monthly time records filed with the Court and with affidavits filed in support of the fee petition. In addition, there has been no objection to the number of hours reported by counsel.

Throughout this litigation, counsel for plaintiffs have exerted substantial and creative efforts to pursue the claims of their clients. In proceeding with the case, counsel made a significant time commitment due to the factual complexity of the case, the novel legal questions involved, and the vigor with which defendants contested the case. The Court has observed all stages of the litigation and notes the tremendous efforts undertaken by counsel to respond to defendants' numerous attacks and the efficiency with which the case has progressed.[86] Given the burdens of the case, the Court finds that counsel were able to accomplish this settlement in an efficient manner and that the hours expended were reasonable.

#### b. *The Attorneys' Customary Fees*

■ The rate to be applied for each attorney in the lodestar analysis should be "based on reasonable standards in the community for attorneys of similar experience in handling similar cases." *Behrens v. Wometco Enter.*, 118 F.R.D. 534, 547 (S.D.Fla.1988), *aff'd* 899 F.2d 21 (11th Cir.1990). The use of current rates charged by the attorney properly accounts for inflation and delay in receipt of payment and is particularly applicable when legal services are performed within a two or three-year period. *Id.; see also, Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *Johnson v. University College of University of Alabama in Birmingham*, 706 F.2d 1205, 1210–11 (11th Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983).

■ The affidavits filed in support of counsel's joint application include a description of each attorney's relevant educational background and legal experience; their hourly billable rates; a summary of the number of hours spent by each attorney; and a description of their responsibilities in this litigation. The hourly rates for partners in this litigation range from $125 to $500. The hourly rates of the 12 members of the Steering Committee range from $205 to $425. Pitts Carr, liaison counsel, charges $275 per hour and the 4 co-lead counsel, Black, Cohen, Labovitz, & Nast, average an hourly rate of $337.50.

■ The Court concludes that the current rates utilized by plaintiffs' counsel in their affidavits are reasonable. While top hourly rates are charged by senior partners in some of the firms representing plaintiffs, the Court finds these rates appropriate in this case in view of the complexity of the action and the expertise required to litigate a class action involving potentially the largest consumer class in history. The experience,

---

85. At the Court's request, plaintiffs submitted a Statement of Work Assignments outlining the principal work assignments made to particular firms. Statement of Work Assignments, filed January 12, 1993. Immediately following their appointment by the Court, the co-chairs of the Steering Committee and liaison counsel assigned overall responsibility for broad general areas among themselves. Assignments of discrete tasks were then made to various firms. After review of the statement, the Court is impressed with the organization and thoroughness of the work assignment plan. There is no indication of the possibility of unnecessary or duplicative work. Instead, plaintiffs set up a system to streamline all of the work necessary for the successful pursuit of the litigation.

86. Class counsel expended enormous efforts particularly to litigate the following problem areas:

(1) Class certification raised novel issues concerning impact and notice;

(2) Counsel reviewed more than 1.6 million pages of discovery and participated in approximately 100 depositions, including employees of defendants from the most junior analyst to senior management;

(3) Class damage analysis was complicated because of the number of airline hubs involved and the difficulty of identifying a benchmark for damage analysis where data was available for the appropriate time periods; and

(4) Settlement negotiations complicated by the financial position of the industry and the different positions of each defendant.

reputation, and ability of counsel are highly relevant to an examination of hourly rates.

It is also clear that but for the expertise which plaintiffs' counsel had developed in prior litigation of this type, many more hours would have been expended in prosecuting this case.... It is ironic that less experienced counsel would have spent more time in discovery and in litigating the question of class certification, thereby elevating the lodestar figure. Certainly, it would be unfair to penalize plaintiffs' counsel for reducing the number of hours actually spent in preparing this matter for trial.

*Bullock v. Administrator of Estate of Kircher,* 84 F.R.D. 1, 17 (D.N.J.1979).

Co-lead counsel in this action and many of the Steering Committee members have excellent reputations and extensive experience in the fields of antitrust and class action practice. Counsel have appeared before the Court routinely throughout the past three years at various hearings and have filed numerous briefs and documents throughout the litigation. The Court has been extremely impressed by the level of knowledge and skill possessed by all counsel and is influenced by counsels' commitment to the best interests of the class. In addition, the challenge faced by plaintiffs was considerable; defendants were represented by able and large law firms with vast resources at their disposal. The Court is convinced that the class received the best representation possible and finds the current rates charged by counsel reasonable for the purpose of examining the lodestar in this action.

██ Using the hourly rates attested to in the individual fee affidavits, the lodestar fee in this case is $7,866,298.70. The Court's fee award, therefore, includes a multiplier of approximately 1.83. The Court finds this minimal enhancement of the lodestar appropriate and will examine the relevant *Johnson* factors supporting the use of a multiplier.

### c. *Contingency*

The Court finds that the multiplier appropriately reflects the contingency nature of the present action. "In the rare case, enhancement may be appropriate if there is a risk of non-recovery of a fee in the case" and then "only where it is shown that such enhancement is necessary to assure the availability of counsel." *Norman,* 836 F.2d at 1302 (citing *Pennsylvania v. Delaware Valley Citizens Council,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). Contingency is measured by "the probability or likelihood of success viewed at the time of filing suit." *Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 679, 700 (M.D.Ala.1988).

Any fee to be recovered as compensation by class counsel in this matter was contingent upon their receiving a recovery for the class. The evidence presented at the hearing on attorneys' fees demonstrated that class counsel had no agreement with anyone for compensation for their time spent in achieving the fund for the class. Counsel have performed an enormous task, working almost full-time in this case with the expectation of receiving their fee solely out of the fund in an amount to be determined by the Court. Class counsel have borne the entire risk of failing to achieve a successful and substantial result for the class. Despite their vigorous and competent efforts, success in contingent litigation is never assured. In addition, the possibility of not recovering a fee was heightened by the novelty and difficulty of the questions presented in this case which were in considerable dispute.

The only certainty for counsel in pursuit of this action was that there would be no fee without a successful result and that such a result would be realized only after lengthy and difficult effort. Class counsel advanced $1.6 million in expenses and co-lead counsel certainly have foregone fees in other cases to pursue the present action. The Court finds that in order to reach a reasonable fee that is fully compensatory under the lodestar method, an enhancement of the lodestar is appropriate to reflect the contingent nature of this action.

### d. *The Skill Requisite to Perform the Legal Service Properly*

This case involved a number of exceedingly complex questions of law and fact. To adequately pursue plaintiffs' claims, counsel had to master the ATPCO computer system to learn how each defendant airline used

ATPCO and how defendants processed the ATPCO data as it was received. Counsel also had to trace the internal operations of each airline to understand how and why fare changes were implemented—all in the context of hundreds of thousands of fare changes made annually. In addition, counsel worked extensively with experts on damage and computer data analysis. Throughout the course of the litigation counsel exhibited the skills and expertise required to obtain necessary factual information and to perform legal services for the class. The Court has never questioned the skill of plaintiffs' counsel and notes that it was only through counsels' considerable efforts and abilities that plaintiffs' claims survived defendants' many challenges and culminated in a beneficial settlement. The Court finds that the exceptional skill and representation provided by plaintiffs' counsel warrants an enhancement of the lodestar.

The Court has examined the fee award under the lodestar analysis as "a means of providing quantifiable documentation of services rendered as a yardstick against which the Court can examine the reasonableness of the fee awarded." *Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 679, 702 (M.D.Ala.1988); *see also Camden I Condominium Association, Inc. v. Dunkle*, 946 F.2d 768, 775 (11th Cir.1991). In light of the factors examined above, the Court concludes that a multiplier in the amount of approximately 1.83 is justified for an adjusted lodestar of $14,378,245.74. Counsel also request reimbursement for expenses totalling $1,634,254.26 for a total lodestar plus expenses of approximately $16 million. After review of the affidavits of each plaintiffs' counsel in summary of its disbursements, the Court finds the expenses necessary and reasonably related to the prosecution of this case. *In re THC Fin. Corp. Litig.*, 86 F.R.D. 721, 740–41 (D.Haw.1980).

### 7. Conclusion on Fee Award

Class counsel in this action are entitled to attorneys' fees measured as a percentage of the fund created for the class by their efforts. The Court finds that a percentage award of 5.25% of the fund, including expenses, to be reasonable. The Court, however, having adjusted the value of the fund to reflect the probable redemption rate, finds that the fund from which to calculate the percentage award amounts to $254–$356 million. Therefore, instead of the $24 million requested in the fee application, the Court awards class counsel a fee of approximately $14.3 million, plus expenses. In its review of the factors supporting this award, the Court also arrived at a lodestar figure with a multiplier of approximately 1.83 which the Court finds reasonable under the circumstances. Next, the Court will briefly review the allocation of the fee award, examine the request for cash awards to the named plaintiffs, and review the fee petitions filed on behalf of individual objectors and proposed intervenors.

### C. Allocation of Award Among Counsel

■ Class counsel have not submitted an agreement by all plaintiffs' counsel concerning the allocation of a fee award among counsel. Ideally, allocation is a private matter to be handled among class counsel. Newberg, *Attorney Fee Awards* § 2.16 (1986). The Court will allow class counsel thirty days to meet and negotiate an allocation agreement for submission to the Court. In the absence of a unanimous allocation agreement among counsel, the Court will set the matter down for a hearing and will allocate the overall award among participating counsel based on the reasonable efforts and relative responsibilities they exercised (not necessarily correlated to the hours expended) leading to the creation of the common fund for the benefit of the class. The Court does not wish to be the arbiter between counsel who previously have been successful in their joint efforts and strongly encourages counsel to reach an agreement concerning the allocation.

### D. Award to Class Representatives

■ Counsel request that each class representative who produced documents receive $2,500, in addition to whatever proportionate share of the certificates the class member is entitled to, and that each class representative who was also deposed receive a $5,000 award. The aggregate amount of these awards is $142,500. Public Citizen objects to the amount of the requested awards and calls for a showing that the depositions were longer

than one or two hours and a showing that the class representatives were not employed full-time by the law firm which filed suit in their name.

The Court finds that incentive awards are appropriate to recognize the efforts of the representative plaintiffs to obtain recovery for the class. "Modest compensation may sometimes be merited for extra time spent by the class representatives in meeting with class members, gathering discovery materials on behalf of the class, and similar efforts." *Manual for Complex Litigation* § 30.41 n. 86 (2d ed. 1985). Only forty-two individuals out of a class of millions undertook this litigation on behalf of the entire class. No travel agency, large corporation, state government, or public interest group lent its name to the action. The representative class members were required to participate in some pretrial discovery including document production and oral depositions. The Court finds the awards for the named plaintiffs reasonable in light of their contribution to the class. *See In re GNC Shareholder Litig.,* 668 F.Supp. 450, 451 (W.D.Pa.1987); *Bogosian v. Gulf Oil Corp.,* 621 F.Supp. 27, 32 (E.D.Pa.1985).

### E. *Additional Fee Petitions*

A number of objectors have filed petitions for the reimbursement of attorneys' fees and expenses incurred in their opposition to the settlement. Keeping in mind George Bernard Shaw's observation that "all progress depends on the unreasonable man," the Court finds that the contributions made by many of the objectors benefited the class and assisted the Court in its review of the settlement. The Court will reward certain of these efforts through a limited award of fees and expenses amounting to .266% of the median value of the common fund.

 An objector to a class action settlement is not generally entitled to an award of counsel fees. Where the objections filed, however, "produced a beneficial effect upon the progress of the litigation, an award of

fees in appropriate." *Frankenstein v. McCrory Corp.,* 425 F.Supp. 762, 767 (S.D.N.Y.1977) ("The objections raised, although ultimately overruled, were not frivolous, and the presence of an objector represented by competent counsel transformed the settlement into truly adversarial proceedings.") If objectors' appearance sharpens the issues and debate on the fairness of the settlement, their performance of the role of devil's advocate warrants a fee award. Objectors deserving of compensation may cause the Court "to spend even more hours in analyzing and assessing the complex agreement, and cast in sharp focus the question of the fairness and adequacy of the settlement to all members of the class." *Id.; see also Fisher v. Procter & Gamble Mfg. Co.,* 613 F.2d 527, 547 (5th Cir.1980); *Howes v. Atkins,* 668 F.Supp. 1021, 1027 (E.D.Ky.1987).

Twelve objectors and proposed intervenors have filed fee applications with the Court.[87] The objections of eight of these applicants were presented to the Court at the Fairness Hearing. Of the remaining applicants, the Virgin Islands withdrew its objection after negotiating successfully with the parties to amend the settlement to include the Virgin Islands in the description of domestic travel, and the Hotel Employees and Restaurant Employees International Union ("H.E.R.E.I.U.") participated by brief and in meetings of the Settlement Administration Committee to voice its objection to the use of black-out periods with the certificates. The final two fee applicants, class members Leon Cooper and Marilyn Berger, filed written objections to the settlement which are identical to other objections presented yet did not appear at the hearing on the settlement, nor participate in meetings with the Settlement Administration Committee. With the exception of these two objectors, the Court finds that the fee applicants are entitled to reasonable compensation for their efforts involved in objecting to the settlement. The Court will examine the applications of those objecting parties whom it deems are entitled to

---

87. Fee applications have been filed on behalf of Armstrong World Industries, Inc.; LeeAnn Bauder, et al.; Marilyn and Dorian Berger; Coalition for Concerned Travelers; Leon Cooper; Hotel Employees and Restaurant Employees International Union; Andrew Hudders, et al.; Management Travel Consultants, Inc.; Public Citizen, et al.; Jane Simon, Inc.; Travel Analysts; and the Government of the Virgin Islands, et al.

fees first, and will then dispose of the remaining fee applications.

### 1. Counsel for Objectors and Proposed Intervenors Entitled to a Fee Award

■ The objection component in the settlement approval process in this case has been crucial to the Court's consideration of the fairness of the settlement and was enhanced by the active participation of several fee applicants. For instance, the formidable opposition to the travel agent restriction waged by travel agent representatives and class members early in the approval process resulted in defendants' waiver of the prohibition. In addition, arguments against the parties' summary valuation of the settlement assisted the Court in adjusting the economic value of the settlement for the purpose of examining the fairness of the settlement and calculating the appropriate fee award to class counsel. Furthermore, several objectors participated extensively with the Settlement Administration Committee to clarify many provisions of the settlement agreement and the claims forms and to streamline proof requirements, all to the benefit of the class.

The Court finds that the efforts on behalf of objectors Armstrong, Bauder, Coalition for Concerned Travelers, H.E.R.E.I.U., Hudders, MTC, Public Citizen, Jane Simon, Travel Analysts, and the Government of the Virgin Islands, assisted the Court in thoroughly examining the settlement. These objectors significantly refined the issues germane to a consideration of the fairness of this complex settlement and their participation transformed the settlement hearing into a truly adversarial proceeding. In addition, the objectors participated significantly in the process and performed a valuable service for the class, even though their objections did not prevail. The Court concludes that compensation for the few participants who continually advanced the interests of the class and assisted the Court in its consideration is appropriate.

■ Most counsel for objectors have requested an award equal to the hours actually spent objecting to the settlement and working with the Settlement Administration Committee times their customary hourly rate. MTC, however, requests an award of $3.2 million, arguing that such compensation for their efforts represents a reasonable percentage of the common fund. The Court finds MTC's request exorbitant under the circumstances of this case. Counsel for all objectors did not become involved in this action until the settlement was achieved by class counsel. Counsel did not work over the course of three years against a vigorous defense in pursuit of complex and unique claims, nor did counsel shoulder the financial burden of pursuing the action. Instead, objectors argued the nuances of the settlement during the twilight of this litigation. The Court does not find MTC's contribution so exceptional as to warrant the excessive fee requested.[88] An appropriate fee award for objectors under these circumstances would compensate counsel for the reasonable fees and expenses actually accrued in pursuit of their objections, nothing more.

Accordingly, the Court will award a fee to objectors Armstrong, Bauder, Coalition for Concerned Travelers, H.E.R.E.I.U., Hudders, MTC, Public Citizen, Jane Simon, Travel Analysts, and the Government of the Virgin Islands, in the amount of the lodestar submitted in their affidavits plus expenses.[89]

---

88. MTC argues that its efforts to eliminate the restriction on redemption of certificates through travel agents warrants an award of a reasonable percentage of the common fund. MTC, however, was one among thousands of objectors who argued that the settlement should not be approved with the travel agent restriction. MTC extensively briefed the issue arguing that the prohibition amounted to an antitrust violation and submitted expert affidavits supporting its position. While MTC put forth substantially more effort than the typical objector, it was not singlehandedly responsible for the elimination of the restriction. Rather, MTC was a significant contributor to a large chorus of objectors. The objector should not be awarded disproportionate compensation for its efforts.

89. In calculating the lodestar, the Court excluded any charges included in the affidavits for preparation of the fee application. Also, the hourly rates charged by the applicants ranged from $180 to $280 with the exception of MTC whose counsel charged up to $450 per hour. The Court finds the hourly rates charged by MTC excessive for the work performed during the limited objection period. Accordingly, in calculating MTC's

The Court finds the award of the fees and expenses listed below reasonable for the work performed.

| | Fees | Expenses |
|---|---|---|
| Armstrong | $ 71,405.50 | $ 7,825.57 |
| Bauder | $ 63,425.00 | $ 4,511.60 |
| Coalition | $ 79,414.00 | $ 6,136.26 |
| H.E.R.E.I.U. | $ 11,689.50 | $ 749.51 |
| Hudders | $148,173.25 | $ 4,820.97 |
| MTC | $277,263.00 | $61,176.23 |
| Public Citizen | $ 17,965.00 | $ 1,379.97 |
| Jane Simon | $ 10,082.50 | $ 382.43 |
| Travel Analysts | $ 12,403.70 | $ 5,200.00 |
| Virgin Islands | $ 26,208.75 | $ 144.50 |

The total award to objectors' counsel, fees of $718,030.20 and expenses of $92,327.04, is equal to .266% of the median value of the common fund in this action. The Court finds that an award of .266% of the common fund to objectors' counsel is appropriate compensation for their contribution to the class.[90]

### 2. Leon Cooper

Objector Leon Cooper has filed a multitude of motions with the Court, including at least four fee applications. Cooper's filings are confused and difficult to follow. He first objected to the settlement on the basis that the certificates lacked substantial value. Cooper next argued that plaintiffs' case was without merit and moved for dismissal of the action. In a recent filing, Cooper indicates that he will agree to support the settlement if the parties join in his fee application and if defendants provide free drink coupons to all class members for redemption on future flights. Cooper requests a fee award of $5,000,000.

Cooper has not appeared at any hearing held by the Court on the settlement and has submitted no evidence in support of any of

his various positions. The Court finds that Cooper's participation in the objection process has neither benefited the class nor assisted the Court to a degree that warrants a fee award. Accordingly, the Court will deny Cooper's fee applications.[91]

### 3. Marilyn Berger, et al.

■ Individual class members Marilyn and Dorian Berger have petitioned for a fee award of $5,320. These objectors' participation in the action was limited to the filing of written objections raising the same arguments as those raised by numerous other objectors. They did not appear at the Fairness Hearing nor did they meet with the Settlement Administration Committee. The Court does not find the efforts of the Berger objectors significantly contributed to the process in a manner that warrants a fee award.

## VII. CONCLUSION AND ORDER ON MISCELLANEOUS MOTIONS

The time has come for the rational and practical resolution of this complex litigation. Having reviewed all documents, testimony, and evidence submitted on this matter, the Court finds that the settlement is fair, adequate, and reasonable and that approval is in the best interests of the class. Accordingly, the Court GRANTS plaintiffs' Motion for Final Approval of Settlements [# 314] and GRANTS IN PART AND DENIES IN PART Plaintiffs' Counsels' Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Award to Class Plaintiffs [## 315]. The Court AWARDS plaintiffs' counsel attorneys' fees of $14,378,245.74 and reimbursement of expenses of $1,634,254.26, and APPROVES awards to representative

---

fee award, the Court has capped the hourly rate charged by MTC at $300.

90. The combined percentage award to class counsel and objectors' counsel equals 5.52%, well below the 20–30% threshold established by the 11th Circuit in *Camden I.*

91. Objector Cooper also moved for sanctions against plaintiffs and defendants for failure to provide copies of the complaint and other filed documents. The parties are not required to pro-

vide class members with items that are a matter of public record and available for a fee from the Clerk of Court. Cooper also moved for advance certification of this matter for appeal should the Court approve the settlement. The Court may certify this matter for appeal only *after* entry of a final judgment or, should objector so move, after a finding that an interlocutory appeal is proper. Accordingly, the Court will deny objector Cooper's motions for sanctions and for certification of appeal.

class plaintiffs in the amounts detailed in this order. The Court DIRECTS counsel for plaintiffs to submit a joint plan for allocation of the fee award within 30 days of the date of this order.

The Court GRANTS IN PART AND DENIES IN PART, according to the findings set forth in this order, the following fee applications filed by objectors:

Motion for Award of Attorneys' Fees & Reimbursement of Costs by MTC [# 497, # 491]; Motion by Hudders, et al. for Award of Attorneys' Fees [# 622, # 624]; Motion by Travel Analysts for Reimbursement of Attorneys' Fees & Expenses [# 635]; Motion by Virgin Islands for Leave to File Application for Reimbursement of Attorneys' Fees & Expenses [# 648–49, # 657]; Motion by H.E.R.E.I.U. for Leave to File Application for Reimbursement of Attorneys' Fee & Expenses [# 650]; Motion by Coalition of Concerned Travelers for Reimbursement of Attorneys' Fees & Expenses [# 655, # 656]; Motion by Armstrong for Award of Attorneys' Fees and Reimbursement of Costs [# 660–61]; Motion for Award of Attorneys' Fees and Expenses by Public Citizen [# 667]; Jane Simon, Inc.'s Application for Attorneys' Fees & Expenses [# 627]; and Lewis Saul's Application for Attorneys' Fees & Expenses [# 676].

The Court DENIES the following miscellaneous motions concerning objectors and proposed intervenors:

ASTA's Motion to Intervene and Motion for Clarification [# 321, # 475]; Motion by MTC to Intervene and for Subclass Certification, Motion for Judicial Notice and Order to Show Cause, and Motion for Consent Order [# 295, # 300, # 338]; Motion by Travel Agents of the Carolinas to Intervene [# 325]; Motion by Public Citizen to Intervene [# 380]; Motion by Leon Cooper for Attorneys' Fees, Motions for Sanctions Against Plaintiffs and Defendants, Motion for Certification of Appeal, Omnibus Motion to Discuss Settlement, and Final Fee Application [# 382–86, # 496–97, # 498–99, # 575, # 589]; Motion by Coalition for Concerned Travelers to Intervene [# 425]; Motion by Armstrong to Certify Subclass

[# 454]; Motion by American Express to Intervene or to Be Joined [# 457]; Motion by Leeann Bauder, et al. to Intervene [# 593]; Motion by Mark Schlachet for an Order [# 404]; and Motion by Arthur Goldberg for Service of Pleadings [# 506].

The Court GRANTS the following motions:

Motion by ASTA to Participate Amicus Curiae [# 289]; Motion by Virgin Islands to Participate Amicus Curiae [# 367]; Motion by WTT to Withdraw All Pending Motions [# 444 (withdrawing # 302 and # 335) ]; Motion for Delay on Fee Allocation [# 663]; and Motion by Alaska Airlines to Withdraw Motion to Intervene [# 510 (withdrawing # 310) ].

The Court DENIES AS MOOT the following motions:

Motion by Delta for Discovery of Class Members [# 239]; Motion In Limine by Delta [# 240]; Motion by Defendants for Partial Summary Judgment [# 243]; Motion by Defendants to Require Individual Notice [# 249]; Motion by American to Supplement Its Opposition [# 259]; Motion by Defendants to Extend Time to Respond [# 269]; and Motion by Defendants for Class Decertification [# 276].

The Court DIRECTS the parties to execute the settlement as set forth in the respective agreements between the parties. The Court retains jurisdiction over this matter as may be necessary to oversee the administration of the settlement and any related matters. The Court DIRECTS the Clerk to enter Final Judgment in each of these consolidated actions.

IT IS SO ORDERED.